[No. 38791.    En Banc.    December 30, 1967.]

JOHN GRAYSON, *Respondent*, v. THE CURTIS PUBLISHING
COMPANY et al., *Appellants*.*

*Skeel, McKelvy, Henke, Evenson & Uhlmann (Pepper,
Hamilton & Sheetz,* of counsel), for appellants.

*Bassett, Donaldson & Hafer* and *Foster & Foster,* for re-
spondent.

HUNTER, J.—This libel action arises from an article in the
Saturday Evening Post, published by Curtis Publishing Co.,
and Curtis Circulation Co., defendants (appellants), re-
ferred to hereafter as "Curtis," which reported in its Janu-
ary 5-12, 1963 edition a referee's description and criticisms
of "Basketball's Bullies, reckless coaches, rowdy players
and riotous fans [who] disgrace our colleges . . . ."
John Grayson, the plaintiff (respondent), and head basket-

*Reported in 436 P.2d 756.

ball coach at the University of Washington at the time of the publication in 1963, was prominently named in the article as an example of "explosive bench behavior"—a coach's reaction to adverse decisions by a referee—which contributes to the country-wide "scandal" of "rabble-rousing" and violence that erupt at these emotion-filled contests. The referee, Al Lightner, told the story of his personal involvement to Al Stump, a free-lance writer, the pertinent part of which reads as follows:

*Why did this Seattle crowd break loose during Washington-U C.L.A. game?*

*Referee Lightner (above) puts part of the blame on coach Grayson (left)*

# Basketball's Bullies

Reckless coaches, rowdy players and riotous fans disgrace our colleges, says one top referee. • By AL LIGHTNER as told to AL STUMP

On the evening of last March 2, I stopped by the University of Washington Hospital in Seattle to visit my wife, Alma, who had undergone heart surgery two days earlier. Then I drove a few blocks to Edmundson Pavilion, where I was scheduled to referee an important Big Five Conference basketball game between U.C.L.A. and the Washington Huskies.

About 11 p.m. the last shot had been fired and I was back at the hospital. They let me see Alma for a moment. And although she was still weak, she couldn't miss the welt on my jaw, scratches on my face and a bandage covering a cut scalp.

"You look worse than I do," she murmured, without asking what had happened. "Have them roll in another bed."

I'd been the fall guy in the

middle of another basketball riot, and in the Lightner family such things never need explaining. Wild nights on the court are so common that it's nothing unusual when I stomp into the house, kick my equipment bag across the room, swear I'll never step onto another university campus and reach for the first-aid kit. Officiating in this game always has been tough. I've had 23 years of it, coast to coast, including 18 N.C.A.A. regional or national championship play-offs, and the stuff that's been thrown at me would fill a garbage truck—ripe Michigan mackerel, bottles, rock candy, a stink bomb, a piccolo, a pair of women's spiked shoes. This comes under the heading of "minor annoyances" and you take it and smile. But in the past half dozen seasons my job has become intolerable, and I've decided to break the "don't talk" rule that has long been imposed on referees.

## From Insult to Injury

To see these forces at work, take that evening of last March 2 when the local Washington Huskies played U.C.L.A. at Seattle. Tip-off time was still five minutes away when I approached Coach John Grayson of the Huskies to ask, "Who's your captain for tonight?"

The lanky Grayson glared at me. "You're such a smart character—*you* pick him," he snapped.

The fact that Grayson doesn't like referees is well known on the Coast. We officials call him "Mr. T"—for technical foul. In our opinion, he ranks with Branch McCracken of Indiana, Jack Gardner of Utah and Bones McKinney of Wake Forest for explosiveness.

But I let his crack pass. Then, early in the game I called a charging foul on Washington's star forward, Roger Niva. Grayson leaped up, kicked some towels and yelled. "If that isn't the worst —call I ever saw in my life!" Taking their cue from his outburst, many of the 7,000 customers began hurling coins, orange peels, bags and wads of gum at me.

There was no question about my next move. I flashed the technical-foul sign to the scorekeeper, awarding U.C.L.A. a one-point penalty shot. As the ball dropped through the basket, the crowd's muttering built up to an ominous roar. It took no genius to see that trouble was coming. The fans, of course, had no way of knowing that I was acting under orders. Grayson had been a problem for a long time, and Commissioner Bernie Hammerbeck, who assigns Big Five officials, had told me to "nail Grayson the first time he causes trouble. I've had enough of his pyrotechnics."

Then, as if stirring up the well-filled stands weren't enough, Grayson's behavior produced a second result. When one coach begins disputing decisions, his rival across the court begins worrying that this agitation may influence the ref, so he starts popping off himself. And from the bench of Johnny Wooden of U.C.L.A. came a towel and the rasping cry: "Open your eyes, you homer!" "Homer" is basketball lingo for an official who favors the home club. And since I live not many miles from the Washington campus I couldn't ignore the questioning of my integrity. I instantly hit U.C.L.A. with a technical.

The fever now spread to Roger Niva, the Washington star, who screamed dirty words at me after I caught him elbowing the Bruins' Walt Hazzard on a rebound. "Remember what happened a few weeks ago," I warned him. In an earlier game, I'd "technicaled" Niva for the same thing.

Clenching his fists, Niva snapped at me: "I can say anything I want because I'm captain!" That brought more junk flying from above. This time foul calls didn't help. Tempers steamed to the point where courtside fans tried to trip me as I ran past them. When that failed, the Washington cheerleader jumped into my path. Shoving him aside,

I caught a hot penny between the eyes. Today's campus cutups apply matches to coins and throw them in salvos. But all this was nothing compared to what happened near the end of the game. With 17 seconds to play and U.C.L.A. leading by 68-66, I ruled against Washington on where an out-of-bounds ball should be put in play. It was an open-and-shut decision, but Grayson raved and complained to the crowd. It was like ordering a tree and a rope. The Los Angeles boys won 69-66, and as time ran out I heard a familiar sound—rushing feet.

About 50 students and older fans came at me, swinging. A bottle opened my scalp. A handful of campus police tried to hold them back, but I took dozens of punches and elbow blows as we struggled toward the dressing room. One 200-pounder in a "Big W" sweater made a fullback's rush at me. An officer flattened him and hollered at me, "Don't stop—we'll run for it!" Amid falling bodies we made it. A guard was set up outside the locked door.

"Never again while Grayson is coach here," I told the sportswriters, "will I work a game at this school. I get $65 a game to act as a referee. I'm not paid to be a punching bag or to keep the crowd in line while he incites it."

Friends slipped me away later. Large headlines followed. Washington U officials "deplored" the "incident" and Athletic Director Jim Owens officially apologized next day. "For which 'incident' do you apologize?" I asked Owens.

"Why, for the one last night," he said.

"Thanks, I wanted to make sure," I said, "because I've been manhandled here three times in the past two seasons."

Although Grayson eventually added his regrets, my promise not to return to Seattle remains firm. For this wasn't an isolated incident, but simply one more case among hundreds each fall and winter of rabble-rousing, terrible sportsmanship and irresponsible patrolling of a school facility by people supposed to set and enforce good standards of conduct.

I'd like to be able to say we should excuse the actions of coaches. They're in a frenzied, jammed-tight, contagious atmosphere where the score seesaws every few seconds. But I won't make excuses. Grown men shouldn't pound their fists on the floor, shred towels, scream, faint, fling dippers of water. Such people are dangerous—especially since today's kids often have hair-trigger tempers; they've watched TV violence and they respond to every action of the coach.

The text further criticized colleges and universities for their indifference in not backing up officials' crackdowns on unruly players and coaches, and failure to "police the house thoroughly."

Referee Lightner then described the efforts taken at the University of California to control rowdyism, and noted the improvement after the Chancellor of the University decided to "take a hand." A "basketball sportsmanship" project was announced and the student council demanded that everyone behave. The Straw Hat band, noted for its "hot coin" and "paper wad" peltings, was moved well back from the floor and was under surveillance. The California coach "suffered plenty" when his team took a one-sided defeat,

but not once did he protest a ruling. And everywhere that Lightner looked, he saw a policeman.

The article's conclusion made clear that "college students and officials can maintain order if they want to make the effort"; that "the effort must be made soon, or this great game—already crippled by scandals—could be killed for good."

Approximately 4 months following publication of the Post article, the University of Washington declined to renew Grayson's contract as head basketball coach. After failing to gain new employment for the 1963-1964 basketball season, Grayson instituted this action seeking $300,000 compensatory damages.

Curtis answered, admitted publication of the article, but denied any defamatory content and alleged damages. In addition, Curtis pleaded the defenses of substantial truth, fair comment, qualified privilege, good faith, and the absolute protection of the First Amendment as guaranteeing freedom of the press in the absence of malicious publication.

Upon motion of the plaintiff, this sixth and last affirmative defense, which raises the constitutional privilege set forth in the case of *New York Times Co. v. Sullivan,* 376 U.S. 254, 11 L. Ed. 2d 686, 84 Sup. Ct. 710 (1964), was stricken by the trial court ruling that plaintiff Grayson was not a "public official" within the meaning of the rule announced in *New York Times.* Thereafter, the case went to trial on the remaining issues.

Evidence produced at the trial was framed by the issues raised in affirmative defense, and the jury was charged under pre-*New York Times* instructions. The jury returned its verdict in favor of Grayson, awarding him damages in the amount of $175,000. Timely motions for directed verdict, new trial, and for judgment notwithstanding the verdict were made by Curtis and denied by the trial court. Curtis appeals.

Curtis first contends that the trial court erred in denying its motion for dismissal after the plaintiff's opening state-

ment, at the close of the plaintiff's case, and in denying its motion for dismissal and for a directed verdict at the close of all the evidence. This contention is underpinned by the defense argument that the publication is not libelous per se; that the article, considered as a whole, does not charge Grayson with a crime, moral turpitude, lack of integrity, incompetence in his chosen profession; or, state directly or by implication, that Grayson should be scorned, hated, or subjected to public abuse.

■ The complaint alleged that publication of the article tended to destroy the plaintiff's good reputation for integrity and sportsmanship, depriving him of the benefits of public confidence, respect and esteem, and destroyed his career as a basketball coach. The kind of aspersion necessary to come under this phase of the rule of libel per se; *i.e.*, the tendency of the imputation to injure one in his business, trade, profession or office, must be one which is especially injurious to the plaintiff's reputation because of the particular demands or qualifications of his vocation. 1 Harper & James, Torts § 5.12, p. 382; Restatement of Torts § 573, comment *e*. The Restatement notes that:

> Disparagement of a general character, equally discreditable to all persons, is not enough unless the particular quality disparaged is of such a character that it is peculiarly valuable in the plaintiff's business or profession. . . . *It is enough if the statement is of a character to be particularly disparaging of one engaged in such an occupation.* (Italics ours.)

Considering the article as a whole, we think the statements made therein, with respect to the plaintiff's alleged lack of good sportsmanship, and its effect on others, are of such a character as to charge him with an impropriety necessarily affecting his competency to successfully carry on his career as a university basketball coach, an occupation in which the record reveals good sportsmanship is a particularly valuable qualification. Consequently, on this basis, the trial court properly denied the defendants' (Curtis) motions for dismissal and a directed verdict.

Curtis contends that the trial court erred in denying its motions for dismissal and directed verdict for the further reason that the uncontradicted evidence established the substantial truth of the article; *i.e.*, that Grayson did not get along with officials and that his bench conduct created crowd control problems for the referees.

We disagree. The gist of the alleged libel charged that Grayson, during the Washington-U.C.L.A. game was guilty of bench conduct which incited acts of violence against referee Lightner, by dramatically disputing the decisions of Lightner: "Grayson leaped up, kicked some towels and yelled, 'If that isn't the worst—call I ever saw in my life!' . . . It was an open-and-shut decision, but Grayson raved and complained to the crowd. It was like ordering a tree and a rope."

The record discloses that the occurrence of these events, as related, was in dispute; and that this conflict in the testimony constituted a question of fact for the jury's determination. The trial court therefore properly denied the defendants' (Curtis) motions for dismissal and directed verdict on this ground.

Curtis further contends that it was entitled to judgment of dismissal or, in the alternative, a new trial for the reason that the trial court erred in striking its affirmative defense based on the first amendment to the United States Constitution; that the rule of *New York Times Co. v. Sullivan, supra*, does apply to the plaintiff Grayson, as a public official, and required a showing of actual malice in order to warrant any recovery for the alleged libel. The rule as stated in the *New York Times* case is as follows:

> The constitutional guarantees [of freedom of speech and press] require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with "actual malice" — that is, with knowledge that it was false or with reckless disregard of whether it was false or not. 376 U.S., at 279-280.

Curtis argues that the privilege applies to libel actions other than those involving elected public officials; that it applies to all matters of legitimate public concern and persons whose conduct invites public scrutiny and discussion.

The plaintiff's position is, however, that he is not a public official or public man involved in a major political issue of national concern; and that the privilege does not extend to him, as a public figure, since the discussion of basketball and its conduct is not such a public issue as would warrant it to be controlled by the *New York Times* case.

Two cases in point, *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 18 L. Ed. 2d 1094, 87 Sup. Ct. 1975 (1967), and *Associated Press v. Walker,* 388 U.S. 130, 18 L. Ed. 2d 1094, 87 Sup. Ct. 1975 (1967), have been reviewed by the United States Supreme Court since oral argument of the instant case. These cases were consolidated to consider the impact of *New York Times* on libel actions instituted by persons who are *not* public officials, but who are "public figures" and involved in issues in which the public has a justified and important interest, a question expressly reserved in *New York Times,* 376 U.S. 283, n.23. See *Garrison v. Louisiana,* 379 U.S. 64, 13 L. Ed. 2d 125, 85 Sup. Ct. 209 (1964).

■ Despite minority adherence to a new standard for publishers differing from New York Times,[1] the seven members of the court, who reached the question, agreed that the First Amendment guarantees of freedom of speech and press *are* applicable to libel actions instituted by public figures. And in *Walker,* the Supreme Court extended the *New York Times* rule to prohibit a public figure, in which the public has a justified and important interest, from recovering damages for a defamatory falsehood relating to his

---

[1]Four members of the court, Justices Harlan, Clark, Stewart and Fortas would substitute the following for the *New York Times* standard: "a 'public figure' who is not a public official may also recover damages for a defamatory falsehood whose substance makes substantial danger to reputation apparent, on a showing of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." 388 U. S. 155.

[public] conduct unless he proves that the statements were made with " 'actual malice'—that is, proof that the defamatory statement was made 'with knowledge that it was false or with reckless disregard of whether it was false or not.' " *Walker, supra,* at 162 (concurring opinion by Mr. Chief Justice Warren).[2] This required showing of "actual malice" is not so restrictive, however, that recovery is limited to situations where there is "knowing falsehood" on the part of the publisher. As stated by Mr. Chief Justice Warren, at 164:

> Its [*New York Times*] definition of "actual malice" is not so restrictive that recovery is limited to situations where there is "knowing falsehood" on the part of the publisher of false and defamatory matter. "Reckless disregard" for the truth or falsity, measured by the conduct of the publisher, will also expose him to liability for publishing false material which is injurious to reputation.

This disposition of the constitutional applicability of the First Amendment to defamation of public figures, in *Walker* and *Butts, supra,* is controlling of the instant case, since the plaintiff Grayson, like Wallace Butts (a university football coach), and Edwin Walker (a retired Army General), is not a public official, but is a "public figure in which the public has a justified and important interest." See *Spahn v. Julian Messner, Inc.,* 18 N.Y.2d 324, 221 N.E.2d 543 (1966); *Time, Inc. v. Hill,* 385 U.S. 374, 17 L. Ed. 2d 456, 87 Sup. Ct. 534 (1967), cited in *Walker, supra.* See also *Dempsey v. Time Inc.,* 43 Misc. 2d 754, 252 N.Y.S.2d 186, (1964).

It does not follow from this disposition, however, that Curtis, as contended, is automatically entitled to a judgment of dismissal as a matter of law. Whether the article in

---

[2]Four members of the court, Justices Brennan, White, Black and Douglas, joined Mr. Chief Justice Warren in his concurring opinion, in extending the *New York Times* rule to "public figures" in the *Walker* case. Justices Black and Douglas, however, joined only to permit a disposition of the case, having the opinion that an even higher standard than *New York Times* should be applied, it being their view that the First Amendment was intended to leave the press free from the harassment of libel judgments.

the instant case was published with actual malice or with reckless disregard for its truth, as measured by the conduct of the publisher, is a question of fact that has yet to be litigated under the *New York Times* standards, and consequently a new trial is necessitated.

Due to our disposition of this case it is unnecessary to consider the remaining assignments of error.

The judgment of the trial court is reversed, and the case is remanded with directions for a new trial on all issues. Costs will abide the final determination of the case.

FINLEY, C. J., HILL, DONWORTH, WEAVER, and HAMILTON, JJ., concur.

HALE, J. (dissenting)—Before the legal dust from *New York Times Co. v. Sullivan,* 376 U.S. 254, 11 L. Ed. 2d 686, 84 Sup. Ct. 710 (1964), had time to settle, a later decision, *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 18 L. Ed. 2d 1094, 87 Sup. Ct. 1975 (1967), replaced it, in my opinion, as a more proximate authority in the present case. Under the rationale of *Butts,* the instant judgment should be affirmed. Indeed, *Butts* comes far closer to Grayson than does *New York Times Co. v. Sullivan, supra,* and were it not for the punitive damages allowable under the laws of Georgia, *Butts* and the instant case would be strikingly similar.

If I am mistaken about this and *New York Times Co. v. Sullivan, supra,* becomes the final yardstick upon which the law will measure a freeman's rights to freedom from defamation and slander, we are beginning the decline of the rights to privacy cherished by the common law and will ultimately see the end to everyone's commonlaw right to protect his good name and fame by personal action in the courts. The common law aspires to provide a remedy for every legal wrong. It gives to the party aggrieved a choice of whether to seek the remedy and a power with which to assert it. There thus abides in the common law a unique quality, making every man in some degree the master of his own destiny, enabling him to preserve, as it did to establish by his own efforts, his good name and fame.

Even criminal statutes forbidding obscene, profane and libelous language do not in principle violate the first and fourteenth amendments to the United States Constitution.[3]

In this case, I think the evidence permitted the jury to find that the Post article scurrilously defamed and grievously damaged John Grayson. During all of his youth, young manhood and early middle age, Grayson had been identified with education, athletics and amateur sports. For nearly 15 years prior to publication of the Post article, Grayson lived, worked and strived in the collegiate milieu among students, athletes and faculty.

He played on his high school basketball teams, and played varsity basketball 2 years at Eastern Oklahoma A. & M. College, and 2 years at the University of Oklahoma. On graduating from the University of Oklahoma as an accredited teacher in 1938, he taught academic subjects and coached basketball in a junior high school, but this was interrupted by a year of service in the Army during the war. After his discharge from the Army, he coached basketball and assisted in football at Central High School, Muskogee, Oklahoma, for a few years and then at Springfield High School, Springfield, Missouri, for 4 years. Inaugurating his career in college coaching, he was then appointed head basketball coach and assistant athletic direc-

---

[3]*Beauharnais v. Illinois,* 343 U. S. 250, 96 L. Ed. 919, 72 Sup. Ct. 725 (1952) states:

" 'There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, *the libelous,* and the insulting or "fighting" words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. "Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument." *Cantwell v. Connecticut,* 310 U.S. 296, 309-310.' Such were the views of a unanimous Court in *Chaplinsky v. New Hampshire, supra,* at 571-572 [315 U. S. 568, 86 L. Ed. 1031, 62 Sup. Ct. 766 (1942)]." (Italics mine.)

tor at Nebraska Wesleyan University, Lincoln, Nebraska. After 2 years at Nebraska Wesleyan, the University of Oklahoma, where he had been a student and varsity athlete, appointed him assistant basketball coach at a raise in salary from that received at Nebraska Wesleyan. Additionally, he taught academic courses in the graduate school at Oklahoma. Following 3 years as assistant head coach at Oklahoma, Idaho State College, Pocatello, Idaho, engaged him—at an increase in salary—as its head basketball coach in 1953. From Idaho State, he went to the University of Washington under contract with the Associated Students of the University of Washington, a nonprofit corporation, to assume the position of varsity basketball coach. The University of Washington at Seattle is one of the largest universities in the nation, and we should take judicial notice that it is a major center of intercollegiate athletics on the Pacific Coast, facing major competition in basketball, football, crew and track.

By the time Grayson read about himself in the Post article, he had attained a high position in his career as head coach at one of the nation's greatest universities. His professional reputation as a basketball coach and his position in amateur sports, among university people, coaches, officials and sports fans, including the parents and friends of college students, was of great value to himself and to his family. He had much to lose from the defamation.

Among the defamatory statements included in the magazine article—one not alluded to in the majority opinion—at pages 31 and 32 of The Saturday Evening Post for January 5-12, 1963, is found an extremely baleful implication. After describing Grayson as a coach who makes a practice of bullying referees, inciting his players and sports fans to violence, rowdyism, obscenities, and unsportsmanlike conduct, and after vilifying him for acts and personality traits which proclaimed his unfitness to serve as a coach or faculty member at any school or college—or even attending games as a spectator for that matter—the article goes on to say:

Rowdyism in basketball, I believe, contributes directly to a deeper and more serious problem, one that basketball has so far been unable to solve—the "fix" scandals that keep breaking out, season after season. When gamblers see open defiance of authority, officials held in contempt, coaches stirring up trouble and colleges making no move to control the situation, they figure it's a logical next step for them to move in.

A gambler in Kansas City told me, "You know why kids can be bought? They watch their coach panic and go crazy when he's losing and they feel awful. That's as sophomores. By the time they're seniors, they've seen so much daffy stuff they think the whole game is nuts and why shouldn't they make money out of it?"

Thus, without directly saying that Grayson was connected with gamblers, it suggested that he pandered to their sinister influence, and that, because of Grayson and others like him, the gamblers had been able to corrupt a clean sport at its fountainhead; it implied that, but for his willful misbehavior, this corruption might not exist. If false, the article was a vicious one indeed, and in many respects more devastating than that written about Wallace Butts because there the facts purportedly came from eavesdropping—a questionable source, indeed—whereas here the authenticity of the story was buttressed by the unavoidable implication that not only were the writers eyewitnesses to the events but one of them was a participant in them.

In *Butts,* the court makes what seems to me to be a distinction between public officials, *i.e.,* persons holding public office, and persons who, because of their activities, are merely in the public eye, thereby putting a much needed brake in the runaway aspects of the *New York Times* case. The *Butts* opinion, referring to *New York Times, supra,* makes this distinction by saying, at 144:

The questions presented for review there [*New York Times Co. v. Sullivan*] were premised on Sullivan's status as an elected public official, and elected officials traditionally have been subject to special rules of libel law.

The court in *Butts* implied that the most important thesis supporting *New York Times Co. v. Sullivan* was that it

concerned an elected public official, because "Such officials usually enjoy a privilege against libel actions for their utterances," and that "speech can rebut speech, propaganda will answer propaganda." But, in distinguishing it from *New York Times*, the court said in *Curtis Publishing Co. v. Butts, supra,* at 154:

> In the cases we decide today none of the particular considerations involved in *New York Times* is present. These actions cannot be analogized to prosecutions for seditious libel. Neither plaintiff has any position in government which would permit a recovery by him to be viewed as a vindication of governmental policy. Neither was entitled to a special privilege protecting his utterances against accountability in libel.

Thus, after pointing out the distinction between a public official such as Sullivan in *New York Times* and Wallace Butts, the athletic director and formerly the football coach at the University of Georgia, the court, in *Butts,* went on to say, at 154-55:

> And both Butts and Walker commanded a substantial amount of independent public interest at the time of the publications; both, in our opinion, would have been labeled "public figures" under ordinary tort rules.
> . . .
> These similarities and differences between libel actions involving persons who are public officials and libel actions involving those circumstanced as were Butts and Walker, viewed in light of the principles of liability which are of general applicability in our society, lead us to the conclusion that libel actions of the present kind cannot be left entirely to state libel laws, unlimited by any overriding constitutional safeguard, but that the rigorous federal requirements of *New York Times* are not the only appropriate accommodation of the conflicting interests at stake.

The court then proceeded to announce the rule in *Butts* as follows, at 155:

> We consider and would hold that a "public figure" who is not a public official may also recover damages for a defamatory falsehood whose substance makes substantial danger to reputation apparent, on a showing of highly

unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers.

A reasonable paraphrase of the foregoing statement, I think, says that a "public figure" who is not a "public official" may recover damages for a defamatory falsehood of the kind that makes substantial danger to reputation apparent, on a showing of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers.

In affirming the judgment in favor of Butts, the court upheld a verdict of $60,000 in general damages and $3,000,000 in punitive damages. Earlier, the trial court had reduced the $3,000,000 verdict in punitive damages to $400,000, making a total judgment of $460,000. The jury was not instructed in *Butts* that malice must be pleaded and proved to support a verdict for general damages, but was told, in considering punitive damages, "to assess 'the reliability, the nature of the sources of the defendant's information, its acceptance or rejection of the sources, and its care in checking upon assertions.' " These were said to be relevant to a determination of whether defendant had proceeded with " 'wanton and reckless indifference' " when the jury was considering punitive damages.

In referring to compensatory damages of $60,000 or general damages as they were known to the trial court in that case, the Supreme Court said, at 157:

Given the extended history of the case, the amount of the evidence pointing to serious deficiencies in investigatory procedure, and the severe harm inflicted on Butts, we would not feel justified in ordering a retrial of the compensatory damage issue, either on the theory that this aspect of the case was submitted to the jury only under the issue of "truth," or on the very slim possibility that the jury finding regarding punitive damages might have been based on Curtis' attitude toward Butts rather than on Curtis' conduct. (Footnote omitted.)

This, of course, brings Grayson directly within the ambit of *Butts,* for the compensatory damages in *Butts* are the

legal equivalent of general damages allowable in Washington awarded to Grayson. Thus, as I understand the *Butts* case, if one is a public figure rather than a public official, matters of ill will or attitude in cases of manifest defamation need not be specially pleaded and proved to support general or compensatory damages, but may be inferred from the circumstances—malice being indispensable only for punitive damages. After all, unless malice be imported from the words, pictures and drawings, how does one go about proving that a national publishing corporation harbors a grudge or ill will against someone? Corporations, by their very nature as artificial creatures, are impersonal, possessing neither emotions nor sentiments, and reflect only the transient attitudes of the persons who happen to be running them at the time.

In the present case, instructions Nos. 8 and 9 instructed that "fair comment" and "privileged criticism," if shown, would constitute a qualified defense, and that the truth is an absolute defense.[4] And the court instructed, too, that

---

[4] Instruction No. 8:

"The defendants have pleaded the defense of privileged criticism or fair comment in this case. The terms 'fair comment' and 'privileged criticism' mean essentially the same thing.

"You are instructed in this regard that persons who present their work or products to the public for its approval and acceptance thereby subject it to public criticism. Honest comment upon such work as presented to the public is privileged.

"You are instructed that the activities of the plaintiff John Grayson as a coach of the basketball team of the University of Washington, a state institution, were a matter of public concern and interest within this rule at the time the publication in question was made.

"Criticism of the acts and work of public men is privileged even though defamatory if it is based upon a substantially true statement of facts and represents the actual opinion of the critic and is not made for the purpose of causing harm to the person criticized.

"This rule does not require that the criticism express an opinion with which any person of reasonable judgment could possibly agree, but if based on true facts the criticism or .comment may be severe, vehement, exaggerated or even prejudiced."

Instruction No. 9:

"You are instructed that the defendants have interposed the defense

want of malice is a mitigating factor in damages.[5]

The court also told the jury:

> By the laws of this state, neither damages by way of punishment as to a defendant (sometimes called punitive damages or "smart money") nor damages by way of an example to others (sometimes called "exemplary damages") are allowable and you cannot include in your verdict any sum for either of these purposes. Instruction No. 14.

I would think, therefore, that these together with all other instructions, when applied to a flagrant and manifest defamation by a magazine of national circulation, brought this case within the *Butts* rationale. The general damages were affirmed, therefore, in *Butts* under the same circumstances as I would affirm them here, for we do not have punitive damages in this state and the court told the jury so.

The blatant and scurrilous nature of the defamatory remarks against Grayson along with the obvious innuendoes arising from them when considered in light of the undeniable deliberation, planning, preparation, editing and circulation essential to get the libel into the hands of the readers, gave the Curtis Publishing Company ample time and opportunity to investigate and check all phases of the arti-

---

of truth. The defense of truth is an absolute defense and would constitute a complete justification for the publication in question.

"The defendants have the burden of proving that the publication of which the plaintiff complains is true. If you find from a preponderance of the evidence that the factual statements of the publication were substantially true as they relate to the plaintiff, then your verdict must be for the defendants."

[5] Instruction No. 13:

"You are instructed that good faith or lack of malice on the part of the defendants is relevant to the issue of damages. Lack of malice on the part of the publisher is a mitigating factor in respect to the question of the amount of compensatory damages, if any, to which the plaintiff may be entitled. If you should find for the plaintiff in this case, then in assessing the damages, if any, to which he may be entitled, you are to take into consideration as a mitigating factor the good faith of the defendants as you find has been established by a preponderance of the evidence."

cle before circulating it. Thus, the circumstances connected with the manufacture and circulation of the magazine and the libel itself show highly unreasonable conduct, an extreme departure from the standards of responsible publishers.

I would not put the burden of proving malice upon the victim simply because he is in the public eye or occupies a position of prominence, whether he be a brain surgeon, lawyer, professor, bank president, actor, editor, scientist, industrialist, labor leader, clergyman or athletic coach. Although *New York Times* seems to cast this burden on the victim of a libel if he happens to be a public official, I see no reason to change the libel rules further by extending this burden beyond public officials.

Curtis, as has been noted, had the benefit of every material defense. The court advised the jury that the good faith of the defendants and want of malice could be considered as mitigating factors; that the truth was an absolute defense and that Grayson, being a public figure, was subject to honest criticism; and that if based "on true facts the criticism or comment may be severe, vehement, exaggerated or even prejudiced."

That the Post was a magazine of national circulation was apparent to and properly considered by the jury. Before reaching the reader, the magazine had been planned, written, edited, spaced, made up, printed and distributed. The entire enterprise was one of forethought, preparation and studied execution. All of these considerations, I think, put Grayson's case squarely within the rationale of *Butts* in showing a substantial danger to reputation, highly unreasonable conduct, and an extreme departure from the standards of a responsible publisher.

Contrarily, *New York Times Co. v. Sullivan, supra,* relied upon by the majority as of controlling authority, seems to me of little more than purely academic concern in this case. The Supreme Court had published *New York Times* before the Grayson case came on for trial and it was cited in argument to the trial court in connection with the sixth

affirmative defense.[6] The main implication and thrust of arguments based on it were directed to whether Grayson was a public official within the meaning of *New York Times,* for the *public figure* idea had not yet generated. Indeed, defendants here thought to plead the *New York Times* rationale in the sixth affirmative defense by alleging merely that Grayson was an employee of the state. Thus, everyone connected with the instant case—and justifiably so—thought that *New York Times,* seeming then to be an abrupt departure from existing rules of libel, would be applicable to public officials only, that is, only to persons holding what could fairly be called a public office, who, possibly through their office, enjoyed certain immunities from liability for defamation when speaking or writing officially. The trial court accepted this as the meaning of *New York Times.*

That *New York Times* could and ought not be extended or enlarged is clear from a careful reading of it, particularly in this case because Grayson, a basketball coach, is not a public official. Not being a public official, he was entitled to the traditional protection against false, defamatory statements thought to exist under the common law for the protection of everyone's good name and reputation. Therefore, the trial judge, in my opinion, properly struck Curtis' sixth affirmative defense for the reason that John Grayson, holding the position of basketball coach at the University of Washington, could not be said to be a public official.

But the trial court had other good reasons for rejecting the *New York Times* rationale here for there is grave doubt in *New York Times* that the material complained of contained any libel at all concerning the plaintiff, Mr. Sullivan.

---

[6]In its sixth affirmative defense, the defendants pleaded:

". . . That at the time of the publication of January 5, 1963, and at all times referred to in the article referred to in paragraph V of the plaintiff's complaint, the plaintiff was an employee of the State of Washington and, therefore, the publication and article hereinabove referred to is privileged due to the provisions of the First and Fourteenth Amendments of the Constitution of the United States."

The so-called defamatory writing there consisted simply of a large paid advertisement in the New York Times for Tuesday, March 29, 1960, under the caption "Heed Their Rising Voices," and concerned one of the burning political, social and moral issues of the day. The advertisement said that thousands of southern Negro students were engaged in widespread nonviolent demonstrations in positive affirmation of the right to live in human dignity as guaranteed by the United States Constitution and the Bill of Rights. It described a number of incidents in which students engaged in peacefully expressing their views on civil rights through demonstrations had been attacked with force and violence. The advertisement mentioned a number of these incidents. For example, it described events in Orangeburg, South Carolina, a place clearly having no connection whatever with the plaintiff and his official duties, pointing out that

[W]hen 400 students peacefully sought to buy doughnuts and coffee at lunch counters in the business district, they were forcibly ejected, tear-gassed, soaked to the skin in freezing weather with fire hoses, arrested en masse and herded into an open barbed-wire stockade to stand for hours in the bitter cold.

As to Montgomery, Alabama, where plaintiff lived, the advertisement merely stated that

In Montgomery, Alabama, after students sang "My Country, 'Tis of Thee" on the State Capitol steps, their leaders were expelled from school, and truckloads of police armed with shotguns and tear-gas ringed the Alabama State College Campus. When the entire student body protested to state authorities by refusing to re-register, their dining hall was padlocked in an attempt to starve them into submission.

The advertisement mentioned several other incidents of similar nature "In Tallahassee, Atlanta, Nashville, Savannah, Greensboro, Memphis, Richmond, Charlotte," all without any direct or indirect reference to Mr. Sullivan.

More than one-half of the advertisement in the New York Times described the actions of the Rev. Dr. Martin Luther King as a leader in the civil rights movement and

his leadership in advancing that cause by nonviolent methods in southern states. It said that Dr. King had been assaulted in person, had been arrested on fake charges, such as speeding, loitering, and perjury, a felony; that his family had been threatened; and that his home had been bombed. The advertisement or message, as it more properly should be designated, carried the signatures of many well-known actors, actresses, clergymen and persons prominent in the life and affairs of this country, including the widow of a former President of the United States. It closed with a request for contributions to aid the civil liberties movement in the South.

One has to be chasing rainbows to see any connection between Mr. Sullivan and the advertisement. His name was not mentioned in it; it did not identify him as a public official who had failed to discharge his official duties. Actually, he was merely one of three elected commissioners of the city of Montgomery, Alabama, holding some kind of supervision over the police department, the fire department, the department of cemetery and the department of scales. The article did not mention Mr. Sullivan by name, title or office, nor was anything derogatory said of him concerning the conduct of his office. Mr. Sullivan was not a state authority or official. The only possible reference to Commissioner Sullivan as supervisor of the department of scales, department of cemetery, the fire department and the police department is the extremely remote reference in the third paragraph of the full-page advertisement. Sullivan brought action against four residents of Alabama who were Negroes and clergymen, and the New York Times. The jury awarded Mr. Sullivan $500,000 as damages arising from the publication of this paragraph and its circulation by means of 394 copies throughout the whole of Alabama, only 35 of which were distributed in Montgomery County. Of course, when the trial judge instructed the jury that the statements in the advertisement were libelous per se as to Mr. Sullivan, this substantially helped his cause, but the court did not make it clear whether the plaintiff had been de-

famed more particularly as supervisor of the department of cemeteries, department of public scales, the fire department or the police department, or in all four categories.

Manifestly, a verdict of $500,000 arising by virtue of an advertisement having a circulation of 35 copies in the plaintiff's home county in Alabama where he held a city office, against four Negro clergymen residents of that state and against a great New York newspaper which had demonstrated its sympathies for the civil rights movement, showed an unmistakable passion and prejudice and demonstrated conclusively that the defendant could not have received a fair trial. It could well have been said as a matter of law in that case that no fair-minded jury could possibly have awarded one-half million dollars to Mr. Sullivan for the injury claimed.

Mr. Sullivan brought his action in the Circuit Court of Montgomery County, Alabama which awarded him damages of $500,000. This judgment the Supreme Court of Alabama affirmed. *New York Times Co. v. Sullivan,* 273 Ala. 656, 144 So.2d 25 (1962).

But the Supreme Court of the United States, in *New York Times, supra,* reversed the Supreme Court of Alabama not for what seems to be the more obvious reasons, *i.e.,* a gross and palpable miscarriage of justice evidenced by the awarding of one-half million dollars in damages to a city commissioner who had suffered no pecuniary loss whatever nor loss of status or good name in his community, on the circulation of 35 copies of the New York Times in his county, but instead on the asserted basis that the judgment of a court constituted state action abridging the freedom of speech. Little wonder the trial court here found *New York Times, supra,* inapplicable.

Then, too, there were the new constitutional theories in *New York Times* to contend with. The constitution (amendment one) says "Congress shall make no law . . . abridging the freedom of speech, or of the press. . . . " Now, it is quite clear that no law of Congress whatever is involved in Grayson's case nor does it appear

that Congress has ever enacted any statutes abridging the freedom of the Curtis Publishing Company or intends to do so within the immediate foreseeable future. Although the constitutional implication of *New York Times* might be said to apply in libels of a public official, there is no constitutional basis whatever for a holding that a judgment for defamation in a private suit constitutes a state action.

Since the constitutional guarantees set forth in the first amendment to the United States Constitution pertaining to the right to speak and publish freely are limitations upon the Congress and, through the fourteenth amendment to the United States Constitution, become limitations upon the state legislatures, the reading into the constitution the idea that the judgment of a court of competent jurisdiction constitutes a state action in a private civil suit between private parties and is thus the same as an act of Congress or a state statute, stretches the constitution beyond all reason necessary to preserve freedom of criticism against public officials, and would be even more novel if extended to all persons who, because of their business, profession, calling or private actions, have become prominent.

Having made a careful study of that opinion in all its ramifications, the trial court properly declined to extend *New York Times* beyond its stated confines, and properly limited its application to its logical intendments. On review, we will do great mischief to the law of torts and to the long-cherished common-law ambition that for every wrong there is a remedy if *New York Times Co. v. Sullivan, supra,* is extended to every libel case involving persons of prominence. In the coming days when the computer and electronic memory may reign and electrical impulses at the touch of a button spew out a detailed dossier on every living American, I would not relax the most basic protections of individual privacy yet developed in law—the right of every man by personal actions in the courts to hold

1022

accountable every other man for his false and defamatory and damaging utterances.

ROSELLINI, J., concurs in the result of the dissent.

---

March 22, 1968. Petition for rehearing denied.