[No. 39571. En Banc. September 18, 1969.]

RICHARD O. TILTON *et al., Appellants,* v. THE COWLES PUB-LISHING COMPANY, *Respondent.**

*Reported in 459 P.2d 8.

*Quackenbush, Dean & Smith,* by *Jack R. Dean* and *Olson & Johnson,* by *Frank Hayes Johnson,* for appellants.

*Witherspoon, Kelley, Davenport & Toole, William V. Kelley, E. Glenn Harmon,* and *Paul P. Ashley,* for respondent.

NEILL, J.—Plaintiffs are members of the executive committee of the Spokane Area Public Safety Council seeking damages for an alleged libel contained in a story printed in The Spokesman-Review, a newspaper published by the defendant.

The Spokane Area Public Safety Council is an organization made up of all the members of Fraternal Order of

Police Lodge No. 1 and Fire Fighters Local 29. The latter two groups are the policemen's and firemen's unions in Spokane. The Public, Safety Council is financed by funds from both unions. Its main objective through the years has been the preservation of the civil service and pension systems. The group is obviously designed to represent the interests of policemen and firemen in the local political arena. The executive and administrative power of the Council is vested in an executive committee, which is made up of 10 members from each of the two unions plus two cochairmen who are the presidents of the two unions. At the time the article in question was published, the 10 representatives of the Fire Fighters Local were elected from the membership, while the Police Lodge elected five representatives from its membership and allocated the remaining positions to officers of the Lodge.

During the fall of 1965, Spokane was embroiled in a heated political campaign to change from a "City Manager" to a "Strong Mayor" form of city government. A proposal to so change the city charter was to be on the ballot on November 2, 1965. The executive committee of the Public Safety Council was publicly known to be in favor of the charter change. During the months of September and October the committee voted to contribute Public Safety Council funds to C.I.T.Y. (Committee of Interested Taxpayers and You), a group actively working for the charter change.

On Wednesday, October 20, 1965, Jack Roberts, a political writer for The Spokesman-Review, was told of the possibility that a lawsuit seeking to enjoin transfer of police union funds to C.I.T.Y. was to be started. His informant, a former employee in the office of the Mayor of Spokane, was then employed by an advertising agency handling publicity for the supporters of the existing city manager form of city government. Following up this tip, Mr. Roberts telephoned the Spokane Police Chief in an attempt to verify this story. The chief told Mr. Roberts he could release no details at

the time, but agreed to give him an "exclusive" on the story. Mr. Roberts again telephoned the police chief on the evening of October 22nd, and was told that nothing definite had developed, but that something might be ready on the next day, Saturday.

About noon of Saturday, October 23rd, the police chief called Mr. Roberts and told him that if he wanted the story he should be at a certain suite in a downtown office building at 1 o'clock that afternoon. Although Saturday was Mr. Roberts's day off, he went to the designated office. The office was that of one of the attorneys for the plaintiffs in the proposed suit. Mr. Roberts was there given copies of various legal papers pertaining to the proposed lawsuit.

The suit was being instituted by Assistant Police Chief E. W. Parsons and Police Department Secretary W. W. Natwick for the purpose of preventing use of Fraternal Order of Police funds by the Public Safety Council to support the proposed charter change. At the time these papers were given to Mr. Roberts they had not been filed, but Mr. Roberts was told that the named defendants were being served with process at that time. (The action was filed the following Monday.)

Upon leaving the attorney's office, Mr. Roberts, the police chief, and Assistant Chief Parsons went to a restaurant for lunch. Mr. Roberts then returned to his office at The Spokesman-Review and in the course of 30 to 45 minutes wrote the story about the Parsons-Natwick lawsuit. He made no further attempt to verify the story. He testified he did not intend to imply a criminal charge in the story. He also testified that the content of his story was not dictated by his superiors at The Spokesman-Review, nor was he motivated by spite or ill will in writing the story. There is no evidence that Mr. Roberts had actual knowledge that any of the facts or charges related in the story were untrue.

The story written by Mr. Roberts, which forms the basis of this action, was published the next day, Sunday, October 24th, under a front page headline in the following form:

THE SPOKESMAN-REVIEW
Sunday Morning October 24, 1965
 Spokane, Wash.

*In Strong Mayor Campaign*
23 NAMED IN CHARGES
OF ILLEGAL FUND USE
By Jack Roberts
Spokesman-Review Staff Writer

Court appearance summonses were being served Saturday on 23 Police-Fire-Public Safety Committee members involving alleged "unlawful" and "unauthorized" appropriation of $5,300 in Fraternal Order of Police funds for political and financial support of a City Charter change for a Strong Mayor-Council form of city government.

The summons, complaint and notice of hearing on a temporary injunction were being served on as many defendants that could be located. They were being instructed to appear Tuesday at 9:30 a.m. in Superior Court.

The actions, which will be filed Monday were brought by Assistant Police Chief E. W. Parsons and Wesley W. Natwick, Police Department secretary.

Named defendants were Richard O. Tilton, William A. Beeman, Thomas R. Curtiss, Floyd E. Lockie Jr., Raymond O. Bolstad, Mark R. Bauer, Homer C. Hall, Fred C. Judd, Arthur J. Corbett, Richard R. Olberding and Patrick H. Colliton, all officers and trustees of Spokane Lodge No. 1, Fraternal Order of Police.

Remaining defendants, all members of Local 29, International Association of Fire Fighters, included Kenneth D. Miller, Robert E. Munk, William L. Cooke, James K. McBride, Raymond P. LaVigne, James C. Burger, Ted E. Mills, Douglas G. Amsbury, Jack A. Waller, Kenneth A. Bye, Robert J. Hayes and Howard J. Vietzke.

All defendants are members of the Police-Fire Public Safety Committee.

Two law firms are representing plaintiffs Parsons and Natwick. They are Hennessey, Curran & Bentley and Hamblen, Gilbert & Brooke.

Complaint Detailed

The complaint alleges those defendants who are members of the Fraternal Order of Police "joined with the

remaining defendants herein, as members of the Public Safety Committee" to:

"Give political and financial support to a proposed amendment to the charter of the City of Spokane to change the form of government of the City of Spokane from the Council-Manager form to the Strong Mayor-Council form."

The complaint further alleges $5,300 was appropriated from the FOP treasury, which was "unlawful, unauthorized and ultravires for the following reasons":

1. The defendants were not authorized to engage in such activities by the FOP membership through "written ballot after due notice to the members as required by the by-laws of said organization."

2. That no regular or special meeting, as required by the FOP Constitution, was ever called for this purpose.

3. That these activities were in violation of the City Charter and the Police Department's rules and regulations.

### Injunction Sought

The plaintiffs seek a temporary injunction restraining the defendants from continuing to engage in these activities.

The plaintiffs also seek a court order declaring that appropriation of $5,300 from the FOP treasury was unlawful and directing the defendants to redeposit the funds in the treasury.

Moreover, it is alleged in the motion for a temporary injunction that the FOP Constitution provides that all matters affecting policies, aims and means of accomplishing the purposes of the lodge not specifically provided for in the Constitution or by action of the lodge shall be decided by the Board of Directors. It is maintained the expenditure of funds of the lodge must be authorized by the board—and, that a majority of the board must be present for a quorum.

### Written Vote Required

The plaintiffs contend that the by-laws of the lodge require that "all matters of great importance to all members which are not pressing be submitted to a vote of the members by written secret ballot at an election."

The motion stated:

"A substantial number of the members of the lodge have stated to affiant (Parsons) that they object to the

action taken by defendants for the reason that the members were never given an opportunity to vote thereon and the action of defendants was unauthorized and undemocratic."

It is alleged that Parsons asked the FOP secretary to see the minutes of the board concerning the proposal to support the charter amendment and the appropriation of $5,300 from the treasury, but was informed the board "had no meetings on said subjects."

However, the motion contends, the lodge secretary verified that $5,300 had been paid to the Public Safety Committee by direction of Robert O. Tilton, president.

Plaintiffs claim the article is libelous. Defendant pleaded substantial truth and privilege as defenses. At the conclusion of all the evidence, defendant moved for a directed verdict claiming, among other things, that there was insufficient evidence of malice to go to the jury. The motion was denied and the case was submitted to the jury. The jury was instructed that the article in question was published under a qualified privilege and recovery should be allowed only if the jury found by a fair preponderance of the evidence that the defendant was actuated by malice in publishing the story. The jury returned a verdict for each plaintiff in the sum of $13,000.

Defendant moved for judgment notwithstanding the verdict, again arguing insufficient evidence of malice, and alternatively moved for a new trial or a reduction of the amount of the verdict. The trial court ruled there was sufficient evidence of malice to submit the question to the jury, but held that a $13,000 verdict for each of the plaintiffs was punitive and dictated by passion or prejudice. An order was entered granting a new trial unless plaintiffs accepted a reduced award of $2,500 each. Plaintiffs rejected the reduced award and have appealed.

Plaintiffs assign error to the order granting a new trial or reducing the verdicts and to the court's refusal to enter judgment on the verdict. Defendant cross-appeals, assigning error to the trial court's failure to grant a directed verdict or judgment notwithstanding the verdict. Defend-

ant also assigns error to the admission of certain evidence and to the instruction on damages.

The crux of defendant's cross-appeal is its contention that there was insufficient evidence upon which a jury could find the malice which would override the constitutional privilege enunciated in *New York Times Co. v. Sullivan,* 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710 (1964), *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 18 L. Ed. 2d 1094, 87 S. Ct. 1975 (1967), and *Associated Press v. Walker,* 388 U.S. 130, 18 L. Ed. 2d 1094, 87 S. Ct. 1975 (1967), and recognized by this court in *Grayson v. Curtis Publishing Co.,* 72 Wn.2d 999, 436 P.2d 756 (1967).

*New York Times Co. v. Sullivan, supra,* and its progeny represent an attempt to reconcile the protections afforded to the individual by the common law of defamation, and the freedom of press guaranteed by the First Amendment. It must be recognized that a lie repeated in the public media may ruin a person's life and career. "For centuries it has been the experience of Anglo-American law that the truth never catches up with the lie, and it is because it does not that there has been a law of defamation." Kalven, *The Reasonable Man and the First Amendment: Hill, Butts, and Walker,* The Sup. Ct. Rev. 267, 300 (1967). But it is also a general principle embodied in the First Amendment that the public will benefit from the "marketplace of ideas" insured by a free and unfettered press. In fact, such an uninhibited marketplace is one of the cornerstones which supports a free society and may be vital to the survival of our democracy.

A logical corollary of the "marketplace" approach is that the public has no interest in protecting false statements. In fact, if various statements offered to the public were conveniently labeled "This is true" and "This is false" there would be no problem in reconciling the law of defamation with the freedom of the press. Unfortunately, things never appear this simple to the average reporter, the average reader, nor the average jury. As Mr. Justice Harlan has noted, "Any nation which counts the Scopes trial as part of

its heritage cannot so readily expose ideas to sanctions on jury finding of falsity." *Time, Inc. v. Hill,* 385 U.S. 374, 17 L. Ed. 2d 456, 87 S. Ct. 534 (1967). *See* Wright, *Defamation, Privacy and the Public's Right to Know: A National Problem and a New Approach,* 46 Tex. L. Rev. 630 (1968). A newspaper reporter, faced with a rapidly breaking story, will find it impossible to completely insure the accuracy of everything he wishes to print. If he were required to do so in all cases, our press would contain only the most innocuous generalizations about matters of current public concern.

■ The Supreme Court has attempted to reconcile the privacy of the individual with the public interest in vitality in news reporting by decreeing that in some cases individuals must bear the brunt of inaccuracies which are not deliberate. The court has held that a "public official" or a "public figure" may not recover damages for defamation "unless he proves that the statement was made with 'actual malice' —that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan, supra,* 279-280. *See also Associated Press v. Walker, supra,* and *Curtis Publishing Co. v. Butts, supra.*[1] Where a constitutional right conflicts with a common law principle—however ancient or cherished—the guarantee of the constitution must prevail. So it is that the fundamental liberty given to the American news media as announced in *New York Times,* and confirmed in subsequent cases, has been made paramount to the principle described by Justice Hale in his eloquent dissent in *Grayson v. Curtis Publishing Co.,* 72 Wn.2d 999, 1021, 436 P.2d 756 (1967), as "the most basic protections of individual privacy yet developed in law—the right of every man by personal actions in the

---

[1] There is some division in authority as to whether the "actual malice" test contained in *New York Times,* or the requirement of "highly unreasonable conduct" contained in Mr. Justice Harlan's opinion in *Butts* should be applied to public figures. *See* 20 A.L.R.3d 1002 (1968). This court decided that the majority of the Supreme Court would apply the actual malice test to public figures in *Grayson v. Curtis Publishing Co.,* 72 Wn.2d 999, 1006, 436 P.2d 756 (1967), and we adhere to that decision.

courts to hold accountable every other man for his false and defamatory and damaging utterances."

Under current decisions of the United States Supreme Court the initial question to be determined in cases of this nature is whether plaintiffs are public officials or public figures as those terms are defined in *New York Times* and subsequent cases. Although the ruling by the trial court that these plaintiffs were public figures is not challenged here, we include a discussion of the matter in order that the issues of malice and privilege may be placed in proper focus.

■ Plaintiffs are policemen and firemen in the city of Spokane. While under certain circumstances police and firemen may be considered public officials within the New York Times rule, to come within the privilege a public official must have been defamed in respect to his official conduct. *New York Times Co. v. Sullivan, supra,* 279. *See* 19 A.L.R.3rd 1361, 1372-73 (1968). The alleged libel in this case related to plaintiffs' use of funds from the Police Lodge in their activities as members of the executive committee of the Spokane Area Public Safety Council, rather than to their duties as members of the police or fire departments of the city of Spokane. Therefore the libel involved in this case did not relate to the official conduct of plaintiffs. They are not public officials within the New York Times rule.

■ Are plaintiffs public figures? Because the designation of a person as a "public figure" results in a decrease of the protections against invasions of privacy and defamation of character provided by law, such a designation should not be made lightly. Legal rules providing for such a designation should afford the most complete protection of an individual's ambit of privacy consistent with the purposes of the First Amendment. The Supreme Court gave thorough consideration to what constitutes a public figure in *Curtis Publishing Co. v. Butts, supra,* and *Associated Press v. Walker, supra.* In those cases the court determined that both Butts and Walker were public figures using the following rationale, p. 154:

And both Butts and Walker commanded a substantial amount of independent public interest at the time of the publications; both, in our opinion, would have been labeled "public figures" under ordinary tort rules. . . . Butts may have attained that status by position alone and Walker by his purposeful activity amounting to a thrusting of his personality into the "vortex" of an important public controversy . . .

Plaintiffs in this case voluntarily stood for election for the leadership of the Spokane Area Public Safety Council. As leaders of this organization, they represented local policemen and firemen to the people of the Spokane area. They voted to thrust their organization and themselves into a very "hot" political campaign. In addition, at least some of the plaintiffs spoke at public meetings advocating the charter change. In effect, both by assuming their leadership positions and by their subsequent activities, all of the plaintiffs had affirmatively abandoned their public anonymity and thrust themselves into the "vortex" of an important public controversy. We therefore hold that plaintiffs in this case are public figures as that term is defined in *Butts* and *Walker*. The trial court recognized that plaintiffs were public figures and instructed the jury that the news article in question was under a qualified privilege which could be defeated upon proof of defendant's malice. The jury was given the common law definition of malice as well as a definition based upon *New York Times—i.e.,* a knowing falsehood or reckless disregard of the truth.[2]

---

[2]The instructions given by the court, insofar as relevant, are as follows:

Instruction No. 8: "You are instructed that the word 'malice', as used in these instructions, means some sinister or corrupt motive, such as hatred, revenge, personal spite, ill will, or desire to injure plaintiffs, or such gross indifference as to amount to a reckless (as contrasted with merely negligent) disregard of the truth.

"However, mere desire for political defeat of an opposing candidate or political proposition on a ballot does not of itself amount to actual malice which will entail liability for negligent factual errors. The law recognizes that in the rough and tumble debate of public issues, discussions may become robust, wide open and sometimes unpleasantly sharp."

Instruction No. 9: "If you should determine, under the other instruc-

The instructions given by the trial court are now clearly inadequate. Instruction No. 8, which defines "malice" in part as "some sinister or corrupt motive, such as hatred, revenge, personal spite, ill will, or desire to injure plaintiffs," is an erroneous interpretation of the New York Times standard of malice. The Supreme Court decided this question in its per curiam opinion in *Beckley Newspapers Corp. v. Hanks*, 389 U.S. 81, 82, 19 L. Ed. 2d 248, 88 S. Ct. 197 (1967):

> [D]espite the fact that it was recognized at trial that the principles of *New York Times* were applicable, the case went to the jury on instructions which were clearly impermissible. The jury was instructed in part that it could find for the respondent if it were shown that petitioner had published the editorials "with bad or corrupt motive," or "from personal spite, ill will or a desire to injure plaintiff."

tions which I have given you, that the article in question was false and libelous *per se,* then it will become necessary for you to determine whether the defamatory matter was published by the defendant with malice. If so, your verdict should be for the plaintiffs, and if not, your verdict should be for the defendant.

"You are instructed that to publish defamatory matter with knowledge of its falsity or in reckless disregard of whether it is false or not (as contrasted with mere negligence) is, in contemplation of the law, the equivalent of and would constitute malice. Therefore, if you should find that the defendant newspaper published defamatory matter concerning the plaintiffs with knowledge of the falsity thereof, or in reckless disregard of the truth or falsity thereof, your verdict in such event should be for the plaintiffs."

Instruction No. 10: "If plaintiffs fail to prove to your satisfaction by a fair preponderance of the evidence that the defendant was actuated by malice, as defined in the preceding instruction, toward the plaintiffs in publishing the news article sued on, then you must return a verdict for the defendant."

Instruction No. 18: ". . . In testing this question of qualified privilege, you are instructed that when reporting upon public affairs and the activities of public officials, a writer is not held to strict accountability for misstatement of fact if he has tried to ascertain the truth and, on a reasonable basis, honestly and in good faith, believes the statements published by him are true. On the other hand, if a newspaper article is in fact libelous *per se* as I have defined this term, and it is published with knowledge of falsity thereof or in reckless disregard of truth or falsity thereof (as contrasted with mere negligence) then such publication would not be privileged."

The above language clearly removes any doubt as to the impropriety of these instructions which may have arisen from the court's earlier affirmance of a verdict finding liability where similar instructions were given in *Curtis Publishing Co. v. Butts, supra*. The trial in *Butts* was held before *New York Times* and the court has now indicated that a strict compliance with *New York Times* will be required in cases tried after that decision. *See* the concurring opinion of Mr. Chief Justice Warren in *Butts*, 388 U.S. at 165-67.

The error in instruction No. 8 is not cured by the subsequent giving of actual malice instructions in compliance with *New York Times* in instruction No. 9, nor by the apparent reference back to these instructions only in instruction No. 10. The definition of malice in instruction No. 8 applied to that word "as used in these instructions." The *New York Times* definitions in instruction No. 9 were stated to be "the equivalent of" malice. Under these instructions, the jury could have believed that they could find for plaintiffs if the article was published with knowledge of its falsity, with reckless disregard of its truth or falsity, *or* with some sinister motive. This is clearly not an accurate representation of the New York Times standard.

Instruction No. 18 insofar as it implies that a reporter must make some independent investigation before he may have a reasonable belief in the truth of his article is also misleading. Since the trial of this case, the Supreme Court has more completely refined the meaning of "reckless disregard" in *St. Amant v. Thompson*, 390 U.S. 727, 20 L. Ed. 2d 262, 88 S. Ct. 1323 (1968). There the court stated:

> These cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.

While instruction No. 18 does not clearly violate these

standards, it can be read to require reasonable prudence in publication. As such, it should not be included in instructions in cases involving the New York Times privilege.

■ Defendant did not take exception to any of these instructions. Under our law, instructions not excepted to become the law of the case. *Whipple v. Lambert*, 73 Wn.2d 952, 442 P.2d 266 (1968). Therefore, the sufficiency or insufficiency of the instructions is not before us. We have included the discussion of the instructions solely to give a better understanding of the issue which we now examine.

■ Defendant by its motion for directed verdict and its motion for judgment notwithstanding the verdict challenged the sufficiency of the evidence, claiming there was insufficient evidence of malice under the New York Times standard to support a verdict against it. Error is assigned to the denial of both of these motions. This raises a question under the First Amendment which requires our independent examination of the record. An almost identical set of circumstances was faced by the Supreme Court in *Beckley Newspapers Corp. v. Hanks, supra,* at 82:

> Because petitioner failed to object to this erroneous interpretation of *New York Times* at trial, and in fact offered instructions which were themselves inadequate, the issue of these instructions is not before us. However, since it is clear that the jury verdict was rendered upon instructions which misstated the law and since petitioner has properly challenged the sufficiency of the evidence, we have undertaken an independent examination of the record as a whole "so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression."

Our review of the record does not indicate an abandonment of our previous holdings requiring exceptions to challenged instructions. Rather, a verdict of liability in this case not supported by clear and convincing evidence of actual malice would constitute a deprivation of freedom of press. It is our duty upon proper motion to test the sufficiency of this evidence against the correct constitutional standards regardless of the instructions given. This issue

was fully argued and ruled upon in the trial court so our review does not amount to opening a new matter on appeal.

■ To support a verdict of liability in a libel action involving a public official or public figure, plaintiffs must show actual malice with the "convincing clarity which the constitutional standard demands . . ." *New York Times, Inc. v. Sullivan, supra,* at 285-86.

Basically, there are two elements present in this news story which could constitute a libel. The publication of either of these two elements could have been motivated by actual malice. Since we are dealing with the constitutional sufficiency of the evidence and not the instructions, convincingly clear evidence of malice with respect to either element will support the verdict.

■ First, the allegations in the complaint and affidavit for the Parsons-Natwick lawsuit and repeated in The Spokesman-Review news story may have been false and injurious to the reputations of plaintiffs. A newspaper may not avoid liability for repeating the allegations of another merely by identifying their source.[3] *See* 1 Harper & James, Torts § 5.18 (1956). There is no evidence in the record that Mr. Roberts, the reporter, actually knew that these allegations were false. Rather, the question is whether he reported the allegations with reckless disregard of their truth or falsity.

Plaintiffs point out 39 items which they claim are indicia of malice. The most important of these may be summarized as: the mayor and chief of police of Spokane would stand to lose their jobs under a strong mayor system; the position of assistant chief of police would be removed from civil service protection; the employee of the public relations firm who gave Mr. Roberts the "tip" on the story was a former employee of the mayor; plaintiffs in the Parsons-Natwick lawsuit were high employees of the police department;

---

[3] We are not here concerned with the absolute privilege of judicial proceedings. *See McClure v. Stretch,* 20 Wn.2d 460, 147 P.2d 935 (1944). Defendant does not argue the matter of whether an unfiled action in which some defendants have been served with summons is a judicial proceedings.

plaintiffs in the Parsons-Natwick suit and one of their attorneys were opposed to the charter change; The Spokesman-Review was editorially opposed to the charter change; The Spokesman-Review does not normally print stories of unfiled legal actions; this story was written in about half an hour; the word "illegal" contained in the story headline does not appear in the legal papers to the Parsons-Natwick suit; the allegations in the story would normally have warranted investigation. The gist of plaintiffs' contentions seems to be that the story was the result of a politically motivated scheme by the mayor of Spokane, the chief of police and two of his employees, and the newspaper to discredit plaintiffs and the proposed charter change.

 It is now unquestioned that reckless disregard requires a showing of publication with a "high degree of awareness of . . . probable falsity." *Garrison v. Louisiana,* 379 U.S. 64, 13 L. Ed. 2d 125, 85 S. Ct. 209 (1964); *St. Amant v. Thompson, supra.* "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant.*

Defendant in publishing this story, relied upon a complaint prepared by a reputable Spokane attorney and a sworn affidavit of Spokane's assistant chief of police. Mr. Roberts, the reporter, also followed to a certain extent leads given by the mayor's former employee and Spokane's chief of police. A somewhat similar situation was present in *New York Times, Inc. v. Sullivan, supra,* at 287:

> Finally, there is evidence that the Times published the advertisement without checking its accuracy against the news stories in the Times' own files. The mere presence of the stories in the files does not, of course, establish that the Times "knew" the advertisement was false, since the state of mind required for actual malice would have to be brought home to the persons in the Times' organization having responsibility for the publication of the advertisement. With respect to the failure of those persons to make the check, the record shows that they relied upon their knowledge of the good reputation of many of those whose names were listed as sponsors of the adver-

tisement, and upon the letter from A. Philip Randolph, known to them as a responsible individual, certifying that the use of the names was authorized. . . . We think the evidence against the Times supports at most a finding of negligence in failing to discover the misstatements, and is constitutionally insufficient to show the recklessness that is required for a finding of actual malice.

The matter of the reliability of a publication's source is also considered in *St. Amant v. Thompson, supra:*

Closer to the mark are considerations of Albin's reliability. However, the most the state court could say was that there was no evidence in the record of Albin's reputation for veracity, and this fact merely underlines the failure of Thompson's evidence to demonstrate a low community assessment of Albin's trustworthiness or unsatisfactory experience with him by St. Amant.

There is no evidence of a reputation for veracity or lack of it as to the people relied on by Mr. Roberts for his story. In fact, their positions would almost raise a presumption of trustworthiness. The fact that the jobs of the chief of police and his assistant would be thrown into jeopardy by passage of the charter change hardly proves with convincing clarity that Mr. Roberts was aware of the probable falsity of his story.

To require defendant, in effect, to pretry this lawsuit under these circumstances before reporting the allegations of the complaint would seriously limit the free dissemination of news and ideas guaranteed by the First Amendment. We therefore hold that the evidence of actual malice with respect to reporting these allegations was constitutionally insufficient to take this issue to the jury.

The second element present in the news story which could constitute a libel is that the article could be read as reporting a criminal charge. The headline to the article reads "23 Named in Charges of Illegal Fund Use." The opening paragraphs relate that the actions "were brought by Assistant Police Chief E. W. Parsons and Wesley W. Natwick, Police Department secretary." Although the article goes on to relate information which should make it

clear to anyone with a legal education that this was a civil action, a layman could possibly conclude from the story that criminal charges were being brought against the named defendants. If the article does report a criminal charge, it is of course untrue and libelous. The test of whether it does is how it would ordinarily be understood by persons reading it. *Owens v. Scott Publishing Co.,* 46 Wn.2d 666, 284 P.2d 296 (1955). This is a question of fact which was properly submitted to the jury.

With regard to malice as to this element of the story, plaintiffs make a deceptively simple argument. The jury could very well have found that the article would ordinarily be read as reporting a criminal charge—especially considering plaintiffs' reliance on this point at trial. Mr. Roberts, the reporter, knew that this was a civil, rather than a criminal action. Therefore, plaintiffs contend, Mr. Roberts wrote a story reporting a criminal charge knowing that this was false, and this is actual malice under *New York Times.*

If plaintiffs' argument is successful it would mean that a newspaper could still be held liable for an innocent mistake in a story regarding a public figure—a result clearly contrary to what was sought to be achieved by *New York Times, Butts* and *Walker.*

The fatal weakness in plaintiffs' argument is that it does not rely upon a proper examination of the reporter's or the defendant newspaper's intent or knowledge. Mr. Roberts was aware that this was not a criminal action, but the crucial question is whether he was, or at least should have been, aware of the falsity of his story. The Supreme Court's discussion of its prior cases in *St. Amant v. Thompson, supra,* at 731, makes this abundantly clear:

> In *New York Times, supra,* the plaintiff did not satisfy his burden because the record failed to show that the publisher was aware of the likelihood that he was circulating false information. In *Garrison v. Louisiana,* 379 U.S. 64 (1964), also decided before the decision of the Louisiana Supreme Court in this case, the opinion emphasized the necessity for a showing that a false publication was made with a "high degree of awareness of . . . prob-

able falsity." . . . Mr. Justice Harlan's opinion in *Curtis Publishing Co. v. Butts,* . . . stated that evidence of either deliberate falsification or reckless publication "despite the publisher's awareness of probable falsity" was essential to recovery by public officials in defamation actions.

Therefore, in order to find actual malice with regard to this element in the story, plaintiffs must prove with convincing clarity that defendant was aware of a high probability that the public would read the article as reporting a criminal charge, or at least that defendant entertained serious doubts on this matter.

Mr. Roberts testified that he knew this was not a criminal charge and that he did not intend to so report it. Of course self-serving declarations of good faith are of little weight, particularly if the story is fabricated or based upon something as flimsy as an unverified telephone call. *See St. Amant v. Thompson, supra.* However, in this instance the story was based upon information, supplied by at least three reputable people—at least one of whom signed a sworn affidavit.

■ Against Mr. Roberts's professions of good faith, plaintiffs can offer mainly the circumstantial evidence referred to earlier. Plaintiffs rely heavily upon the fact that the word "illegal" did not appear in the complaint of the Parsons-Natwick action, while it did appear in the headline. However, the words "unlawful" and "unauthorized" did appear in the complaint. We did not believe the differing nuances of meaning in these words are so great that only a reckless man would fail to delete the word "illegal." We hold that plaintiffs have failed to show with convincing clarity actual malice by defendant with respect to this element in the story.

Since the evidence of actual malice presented by plaintiffs was constitutionally insufficient to support a jury finding of malice, the trial court erred in failing to grant a judgment for defendant notwithstanding the verdict.

Reversed and remanded with instructions to enter judgment for defendant.

Hunter, C. J., Hill, Finley, Weaver, Hamilton, and McGovern, JJ., concur.

Rosellini, J. (dissenting)—I would decide this appeal in favor of the appellants and reinstate the verdict. The majority does not discuss the question of the propriety of the reduction of the verdict, but content themselves with holding that, *as a matter of law,* there was no malice.

In doing so, they cite no authority for the proposition that the question of malice is one for the court in every case. They cite *Beckley Newspapers Corp. v. Hanks,* 389 U.S. 81, 19 L. Ed. 2d 248, 88 S. Ct. 197 (1967), a scant per curiam opinion which simply held that there was no evidence of malice in that record. Furthermore, that case concerned a small town newspaper's *editorial* criticism of an *elected public official.*

As a matter of fact, the Supreme Court has not held the plaintiff in a "public figure" case to the same standard of proof as it has imposed in "public official" cases. In *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 18 L. Ed. 2d 1094, 87 S. Ct. 1975 (1967), four of the justices thought that a standard of "highly unreasonable conduct" should be applied to public figures, and three other justices thought the evidence of malice (failure to investigate truth of story before publishing) was sufficient. This shows that the United States Supreme Court has not said that the "awareness of probable falsity" test is applicable when the plaintiff is not a public official, but is only a public figure.

*St. Amant v. Thompson,* 390 U.S. 727, 20 L. Ed. 2d 262, 88 S. Ct. 1323 (1968), relied upon by the majority, was a case dealing with a public official and therefore it does not aid this court in deciding the *degree of proof* necessary in a suit by one whom the court finds to be a public figure, rather than a public official.

It is true that this court, and the majority of the court in *Butts,* adopted the *New York Times Co. v. Sullivan,* 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710 (1964), definition of malice in a case involving a public figure. *Grayson v. Curtis*

*Publishing Co.,* 72 Wn.2d 999, 436 P.2d 756 (1967). But we did not there say that the proof necessary to establish that malice would be the same for a public figure as for a public official. It is not unreasonable that a different degree of proof should be required where the defendant is a figure of public interest but is not a public official. *See Note, Constitutional Law—Defamation under the First Amendment— The Actual Malice Test and "Public Figures."* 46 N.C. L. Rev. 392 (1968). As the author of that note says, the First Amendment does not necessarily require that a man who is well known because of his personal qualities be exposed to the same amount of uncompensated libel as the man who holds a public office, simply for the sake of having one legal standard.

The jury's verdict in favor of the plaintiff was affirmed by the United States Supreme Court in *Butts,* which thus held that the evidence, showing not "probable awareness" but merely failure to investigate, was sufficient.

The Supreme Court of Minnesota has even found it possible to interpret *New York Times* as permitting the jury to find reckless disregard of the truth or falsity of an article defaming a *public official,* where the evidence showed that the article was published without sufficient verification but did not show probable awareness of its falsity. *Mahnke v. Northwest Publications, Inc.,* 280 Minn. 328, 160 N.W.2d 1 (1968). The court said that factors which the jury might consider were the gravity of the charges leveled against the plaintiff in the article, the fact that no attempt was made to contact the plaintiff for verification or denial, and the extent of the falsity of the article. In my view those same factors were valid considerations for the jury to take into account in this case, where the plaintiffs were not public officials, but private individuals who were at the most "public figures," and I seriously question whether they can properly be so described.

The evidence in this case shows not only a total failure to check with any person representing the plaintiffs, or to check the bylaws of the council to see if the allegations of

the complaint had any apparent basis, but it also shows a motive to avoid investigation. The defendant newspaper took an open stand on the very issue which was the inspiration of the complaint described in the defamatory article, a stand which was opposed to that of the plaintiffs, and the author knew that those persons who gave him the story also supported the newspaper's position. The jury could well find that he had every reason to be suspicious, and when there is added to these circumstances the very incriminating fact that the article was capped with a headline calculated to produce in the reader the impression that the members of the council had been charged with a crime, the conclusion is all but inescapable that the respondent acted with reckless disregard of the truth or falsity of the accusations.

The fact that the article was capped with a highly misleading headline is glossed over by the majority, which says that the contents of the article removed any false impression created by the headline. But I doubt that readers of newspapers generally examine an article as analytically and carefully as the court does when endeavoring to determine whether it is libelous. The ordinary reader is much more likely to glean a general impression and carry that with him, and a headline is apt to be very influential in creating that impression.

At the very least, the evidence is sufficient to support a *jury* finding that the article was published with reckless disregard of its truth or falsity. This was the opinion of the trial judge who said:

> I have concluded that a high regard for the writers of complaints and affidavits does not as a matter of law preclude the issue of recklessness. Here, there was just no other inquiry made, although Mr. Roberts was well acquainted with the individuals who had the information readily at hand.

In my view, the United States Supreme Court has been faced with some "hard" libel cases, particularly *New York Times Co. v. Sullivan, supra,* and has laid down some broad principles protecting "the right of the public to know" to

the exclusion of the right of the individual to maintain his good name in the community and to recover damages when it is unjustly besmirched. I cannot imagine that the New York Times philosophy will be enlarged so as to make every person whose name comes before the public in one context or another a "public figure" and place him at the mercy of the mass media. While a public figure has not been clearly defined by the court, four of the judges in *Butts* have indicated that, before an individual can be labeled a public figure and consequently be exposed to a greater amount of remediless defamation than the average obscure citizen, he should command sufficient continuing public interest and have sufficient access to the means of counter argument to be able to expose through discussion the falsehood and fallacies of the defamatory statements. *Curtis Publishing Co. v. Butts, supra,* at 155.

Applying this test to the plaintiffs in this action, it should be readily apparent that they do not qualify as public figures. If they had access to any means of counter argument, the record does not disclose it. It is true that they, as representatives of a private organization, participated in public debate on a public issue, but there is no showing that they were able to thrust themselves sufficiently "into the vortex" to command the attention of the public and the cooperation of the news media when they spoke. It would seem to me that, if the justification for denying to a public figure a reasonably accessible remedy for defamation is that he can expose the falsehood because he has the ear of the public and it will listen to his denials and explanations, then it must be shown as a fact that an individual does have access to means of communication sufficient to counteract the attacks upon him before he can be held to be a public figure.

What I fear the courts are overlooking in their ebullient eagerness to apply the philosophy of *New York Times* to every case of libel, is the awesome power of the mass media and the relative helplessness of the individual who gets caught in its jaws.

Marshall S. Shapo, Associate Professor of Law at the University of Texas, has published an article in 46 Tex. L. Rev. 650 (1968) entitled *Media Injuries to Personality: An Essay on Legal Regulation of Public Communication*, in which he makes the following very significant observations:

[I]n our natural attempt to ameliorate the impersonality of society, in our eagerness to communicate with one another, in our hunger for news and gossip, we have bestowed upon the media a power over our lives that ranks them with any monopoly or oligopoly in our society. Indeed, the media serve as a pressure group of unparalleled power, collectively possessing control of all the significant means of governmental access to the people save the mails.

This concentration of power does not always contribute to the robustness of local political life. There are many cities in which it is common knowledge that one who wishes to run for political office is well advised to receive the benediction of the editor of the city's one newspaper, for that medium's endorsement is tantamount to election and its opposition a virtual guarantee of defeat. . . .

. . .

. . . I respectfully suggest that the *New York Times* rule demands an expanded interpretation over the next decade. The necessary development is a perception that the power relationship in the individual situation should bear upon the applicable law. Thus the law should place the media in a favorable position when it undertakes to investigate and criticize institutions that wield great political and economic power and that have a high capability for cloaking their proceedings in secrecy. But it also should make clear that the media shall not be permitted to attack defenseless individuals who lack effective reply or remedy. The *New York Times* doctrine needs the enrichment of explicit recognition not only of the necessity of a free press, but of the realities of power that lie behind the production of the daily paper, the nightly TV news, and the weekly magazine.

(Footnote omitted.) Pp. 653, 657-58.

The majority concluded that, because the plaintiffs are officers of a private organization and, as such, participated in public debate on a public issue, they are public figures.

The only public feature of their activities is the participation in public debate, as I see it, otherwise every person who stands for office in a private organization, formed for private purposes, becomes automatically a public figure. In this case, the organization of which the plaintiffs were officers existed solely to promote the interests of the members; it was not an organization open to the public or designed to serve the public, and the public had no more interest in it than it would have in any other organization of public employees.

If the fact that the plaintiffs are public employees gives them the status of public figures, then so are all the other millions of government employees, no matter how obscure may be their actual status. I doubt that the majority would subscribe to such a thesis. Nor is it reasonable to hold that officers of a private organization, whose purpose is solely to protect the interests of its members, are "public" figures. To be such a figure, in my opinion, an individual must engage in activities which invite and command the attention of the public to that individual, and the interest of the public in his activities must be such that his utterances will be published or broadcast and attended to by readers and listeners.

If the fact that the plaintiffs participated in public debate is all that is required to establish "public figure" status, every individual who exercises his right of free speech or of political activity thereby renders himself vulnerable to attack by any publisher or media owner who disagrees with his position; and if he is defamed the defamer can stave off liability with a cry of "public figure!" The same is true of every group of individuals which organizes and acts together in an attempt to increase its effectiveness in influencing political decisions.

Thus the court has taken the New York Times doctrine, ostensibly enunciated for the protection of freedom of press, and converted it into an instrument for the repression of other First Amendment freedoms, those of speech and assembly. For to subject individuals or groups to the mercies of the media without affording them any practical

redress is bound to inhibit the exercise of those freedoms. The result is a rule of law which provides a license for abuse by the powerful and intimidation for the weak.

In my opinion, in a case such as this where the defendant's newspapers are virtually a monopoly and those papers have taken an editorial stand on a controversial issue of local concern, the court should be inclined to impose upon that defendant an obligation to treat those having opposing views with absolute fairness rather than to prove a protective shield for its defamatory attacks upon them, whether such attacks are disguised as a report of accusations made by third parties or published as accusations by the editors themselves. Otherwise, First Amendment rights may soon be enjoyed only by the privileged few who hold the power of the mass media and will be effectively denied to the individual, contrary, I think to the spirit of the constitution.

Such fairness would require the publisher of an article making charges of unlawful conduct against opponents of its editorial views to at least contact the persons charged and publish their denials, refutations, or explanations at the same time that it published the accusations.

In this case the jury, which heard all of the evidence and deliberated its verdict under instructions which were, if anything, more favorable than the defendant deserved, found that the publication was substantially false and that it was published with reckless disregard of its truth or falsity. In my opinion these questions were for the jury and not for this court, there being substantial evidence to support its findings. The question of damages was also for the jury, and, considering the reprehensible conduct of which the plaintiffs were accused in the publication and the fact that such charges are seldom entirely forgotten, the verdict of $13,000 for each plaintiff does not shock the conscience of this member of the court.

I would reinstate the verdict.

HALE, J., concurs with ROSELLINI, J.

--------

December 18, 1969. Petition for rehearing denied.