[Civ. No. 28338. First Dist., Div. One. May 10, 1972.]

MELVIN M. BELLI, Plaintiff and Appellant, v.
CURTIS PUBLISHING COMPANY et al., Defendants and Respondents.

## COUNSEL

Melvin M. Belli, in pro. per., and Belli, Ashe, Ellison, Choulos & Lieff for Plaintiff and Appellant.

Pillsbury, Madison & Sutro, John B. Bates, Noble K. Gregory and Walter R. Allan for Defendants and Respondents.

## OPINION

SIMS, J.—Plaintiff has appealed from a judgment entered in favor of the defendants following the granting of their motion for a summary judgment in an action in which he sought general damages of $1,000,000 and exemplary damages of $1,000,000 for defamation of character in two articles authored respectively by defendant Richard Warren Lewis and defendant Edward Linn, published in its magazine, The Saturday Evening Post, by defendant The Curtis Publishing Company, and apparently distributed by defendant Golden Gate Magazine Company.[1] Plaintiff acknowledges that the defendant publisher is entitled to the qualified privilege afforded by the First Amendment of the United States Constitution to the publication of matters of public interest about a public figure. Nevertheless he insists that the record demonstrates that there is a triable issue of fact as to whether the alleged defamatory matter was published with actual malice, that is with knowledge that it was false, or in reckless disregard of whether it was true or false. As a postulate for that conclusion he urges that it is not necessary to show that knowledge of the falsity of the material published be brought home to the publisher's editor-in-chief or managing editor, as distinguished from others having a responsibility for publication. He also asserts that it was not necessary to adduce proof of special damages because the articles were libelous per se.

It is concluded on an examination of the record that there is no evidence to raise a triable issue with respect to malice under constitutional prin-

[1]The action was dismissed as to defendant Linn, who was never served, at a pre-trial setting conference. At the hearing on the motion for summary judgment plaintiff conceded that there was no proof sufficient to hold the distributing company in the case, and that there was no evidence of malice or undue negligence against author Lewis. The action, including plaintiff's briefs on appeal, has concentrated on the liability of the publisher. Since no argument has been made with respect to the judgment in favor of author Lewis and the distributor the appeal is deemed abandoned as to them, and the judgment in their favor must be affirmed.

ciples. The judgment must be affirmed and it is unnecessary to consider plaintiff's contention with respect to proof of damages.

The action involves an article by Lewis entitled, "A Flashy Lawyer for Oswald's Killer," which was published February 8, 1964 after plaintiff had been retained to defend Jack Ruby on charges that he murdered the alleged assassin of President John F. Kennedy, and an article by Linn entitled "The Untold Story of Jack Ruby," which was published on July 25 and August 1, 1964 after the trial of Ruby had resulted in his conviction. For purposes of the motion for summary judgment the defendants conceded that the court could assume that the articles were false and that they criticized and defamed the plaintiff, but they insisted that there was no evidence to show that the publisher had knowledge of the falsity of any such statement, in either article or recklessly disregarded whether it was false or not.[2]

The record consists of the depositions of the plaintiff, of Linn, of William A. Emerson, Jr., the managing editor of the publication, and of Otto Friedrich the assistant managing editor of the publication in charge of articles; of plaintiff's answers to three sets of interrogatories submitted to him by the defendants; and of plaintiff's admissions that transcripts of two tapes correctly set forth interviews he gave to author Lewis and to another interviewer.

When this material is winnowed down the plaintiff is left with the following contentions: that there was malice because the publisher had knowledge of false statements in the Linn article because it was inconsistent with the recorded tapes of the Lewis interviews; that there was malice because the Linn article was published in reckless disregard of whether it was true or false as evidenced by the fact it was inconsistent with the Lewis tapes and with what must have been developed if the publisher did the research it claimed to have done.

The record reveals that the matters of which plaintiff complained in the

[2]Counsel for defendants stated, "Now, here, Your Honor, for the purpose of this motion we concede that Mr. Belli has been criticized and defamed by these articles, for the purpose of this motion for summary judgment. The question is not whether or not the article is true or false in reporting on Mr. Belli, and we submit the article is true and that's why I just—to point up the balances here and the actual facts involved, I direct your attention to Mr. Warren Lewis' interview which Mr. Belli has admitted.

"...

"We contended right along if we had to go to trial on the issue of truth, we are quite happy the articles are true, and that the articles are not defamatory. But what we are saying is for the purposes of this motion we don't get to that issue."

Lewis article were all matters which he had divulged, regardless of their truth or falsity, in his interviews with Lewis. His argument on appeal is directed solely to the contents of the Linn article. The evidence bearing on the remaining points is reviewed below.

I

The parties agree that this case is controlled by constitutional principles recently exposited as follows: "In a series of cases beginning with *New York Times Co.* v. *Sullivan,* 376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710, 95 A.L.R.2d 1412] (1964), the Court has considered the limitations upon state libel laws imposed by the constitutional guarantees of freedom of speech and of the press. *New York Times* held that in a civil libel action by a public official against a newspaper those guarantees required clear and convincing proof that a defamatory falsehood alleged as libel was uttered with 'knowledge that it was false or with reckless disregard of whether it was false or not.' *Id.,* at p. 280 [11 L.Ed.2d at p. 706, 95 A.L.R.2d 1412]. The same requirement was later held to apply to 'public figures' who sued in libel on the basis of alleged defamatory falsehoods. The several cases considered since *New York Times* involved actions of 'public officials' or 'public figures,' usually, but not always against newspapers or magazines. Common to all the cases was a defamatory falsehood in the report of an event of 'public or general interest.'" (*Rosenbloom* v. *Metromedia* (1971) 403 U.S. 29, 30-31 [29 L.Ed.2d 296, 304-305, 91 S.Ct. 1811], fns., collecting the cases referred to, omitted.)

In his answer to defendants' third set of interrogatories plaintiff acknowledged that he was a public figure and that the trial of Jack Ruby was a matter of public interest. The applicability of the *New York Times* rule cannot be questioned. (See *Curtis Publishing Co.* v. *Butts* (1967) 388 U.S. 130, 154-155 and 162 [18 L.Ed.2d 1094, 1110-1111 and 1115, 87 S.Ct. 1975], Warren, C. J. concurring [rehg. den. (1967) 389 U.S. 889 (19 L.Ed.2d 197, 198, 88 S.Ct. -11, 13)]; *Rosenbloom* v. *Metromedia, supra,* 403 U.S. 29, 51-52 [29 L.Ed.2d 296, 316]; *Time, Inc.* v. *McLaney* (5th Cir. 1969) 406 F.2d 565, 573 [cert. den. (1970) 395 U.S. 922 (23 L.Ed.2d 239, 89 S.Ct. 1776)]; *Cepeda* v. *Cowles Magazines and Broadcasting, Inc.* (9th Cir. 1968) 392 F.2d 417, 418-420 [cert. den. (1968) 393 U.S. 840 (21 L.Ed.2d 110, 89 S.Ct. 117)]; *Tilton* v. *Cowles Publishing Company* (1969) 76 Wn.2d 707, 716-717 [459 P.2d 8, 13-14] cert. den. (1970) 399 U.S. 927 [26 L.Ed.2d 792, 90 S.Ct. 2238]; *Grayson* v. *Curtis Publishing Company* (1968) 72 Wn.2d 999, 1006-1007 [436 P.2d 756, 761-762]; and Annot., Defamation—Public Figures—Malice (1968) 20 A.L.R.3d 988, § 4, p. 1002; and Libel and Slander—Public

Official (1968) 19 A.L.R.3d 1361, § 8, p. 1379. Cf. *Belli* v. *Orlando Daily Newspapers, Inc.* (5th Cir. 1967) 389 F.2d 579, 587-588 [cert. den. (1968) 393 U.S. 825 (21 L.Ed.2d 96, 89 S.Ct. 88)].)

In *New York Times* the court stated, "This Court's duty is not limited to the elaboration of constitutional principles; we must also in proper cases review the evidence to make certain that those principles have been constitutionally applied." (376 U.S. 254, 285 [11 L.Ed.2d 686, 709]. See also *Rosenbloom* v. *Metromedia, supra,* 403 U.S. 29, 55 [29 L.Ed.2d 296, 318].)

In adopting the foregoing rule, and rejecting the contention that truth alone should be a defense, the court in *New York Times* observed: "A rule compelling the critic of official conduct to guarantee the truth of all his factual assertions—and to do so on pain of libel judgments virtually unlimited in amount—leads to . . . 'self-censorship.' Allowance of the defense of truth, with the burden of proving it on the defendant, does not mean that only false speech will be deterred. . . . Under such a rule, would-be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so. . . . The rule thus dampens the vigor and limits the variety of public debate. It is inconsistent with the First and Fourteenth Amendments." (376 U.S. at p. 279, fn. omitted [11 L.Ed. 2d at p. 706].)

The appropriateness of so reviewing the facts on motion for summary judgment has been recognized. In *Time, Inc.* v. *McLaney, supra,* the court exercised its discretion to entertain an appeal from the denial of such a motion. In recognizing that the situation was unusual the court commented, "The subject matter of this litigation, involving, as it does, the very serious and timely question of how far the First Amendment guarantee of freedom of the press may still be impinged upon by actions for libel, places some cases in a somewhat different category. This follows when the trial court and this court jointly consider that the failure to dismiss a libel suit might necessitate long and expensive trial proceedings, which, if not really warranted, would themselves offend the principles [of free expression] enunciated in Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22, because of the chilling effect of such litigation." (406 F.2d at p. 566. See also *Thompson* v. *Evening Star Newspaper Company* (D.C.Cir. 1968) 394 F.2d 774, 776 [cert. den. (1968) 393 U.S. 884 (21 L.Ed.2d 160, 89 S.Ct. 194)]; *Washington Post Co.* v. *Keogh* (D.C.Cir. 1966) 365 F.2d 965, 967-968 [cert. den. (1966)

385 U.S. 1011 (17 L.Ed.2d 548, 87 S.Ct. 708)]; and *Tilton* v. *Cowles Publishing Company, supra,* 76 Wn.2d 707, 720 [459 P.2d 8, 15-16].)

In the exercise of this power courts have often either approved the granting of a summary judgment or reversed for failure to grant a summary judgment, a motion for directed verdict or a motion for judgment notwithstanding the verdict in cases in which the plaintiff has failed to produce evidence to show the malice required under *New York Times.*[3]

On the other hand, when an issue of fact is presented it is erroneous to grant such a motion and deprive the plaintiff of his right to a jury trial.[4]

In *Goldwater* v. *Ginzburg* (S.D.N.Y. 1966) 261 F.Supp. 784 the district court suggested, "The issue of actual malice on the part of defendants seems peculiarly inappropriate for disposition by summary judgment because it concerns 'motive, intent, and subjective feelings and reactions.' Empire Electronics Co. v. United States, 311 F.2d 175, 180 (2d Cir. 1962); see also 6 Moore's Federal Practice (2d ed.) 2581. The Supreme Court has cautioned against summary judgment 'where motive

---

[3]*Time, Inc.* v. *McLaney, supra,* 406 F.2d 565, 573; *United Medical Laboratories* v. *Columbia Broadcasting Sys.* (9th Cir. 1968) 404 F.2d 706, 712 [cert. den. (1969) 394 U.S. 921 (22 L.Ed.2d 454, 89 S.Ct. 1197)]; *Thompson* v. *Evening Star Newspaper Company, supra,* 394 F.2d 774, 777; *Baldine* v. *Sharon Herald Company* (3d Cir. 1968) 391 F.2d 703, 706-707; *Washington Post Company* v. *Keogh, supra,* 365 F.2d 965, 969-973; *New York Times Company* v. *Connor* (5th Cir. 1966) 365 F.2d 567, 576-577; *Tilton* v. *Cowles Publishing Company, supra,* 76 Wn.2d 707, 725 [459 P.2d 8, 19]; *Tait* v. *King Broadcasting Co.* (1969) 1 Wn.App. 250, 256 [460 P.2d 307, 311]; *Hackworth* v. *Larson* (1969) 83 S.D. 674, 687-688 [165 N.W.2d 705, 712]; *Kruteck* v. *Schimmel* (1967) 27 App.Div.2d 837, 838 [278 N.Y.S.2d 25, 26]; *Gilberg* v. *Goffi* (1964) 21 App.Div.2d 517, 526-527 [251 N.Y.S.2d 823, 831], affirmed (1965) 15 N.Y.2d 1023 [260 N.Y.S.2d 29, 207 N.E.2d 620]; *Silbowitz* v. *Lepper* (1967) 55 Misc.2d 443, 446-447 [285 N.Y.S.2d 456, 459-461]; *Grabavoy* v. *Wilson* (1967) 87 Ill.App.2d 193, 203-204 [230 N.E.2d 581, 586-587]; *News-Journal Co.* v. *Gallagher* (Del.Super. 1967) 233 A.2d 166, 170; *Klahr* v. *Winterble* (1966) 4 Ariz.App. 158, 170 [418 P.2d 404, 416]; and Annotation, Defamation—Public Figures—Malice (1968) 20 A.L.R.3d 988, section 6, page 1005.

[4]*Goldwater* v. *Ginzburg* (2d Cir. 1969) 414 F.2d 324, 335-337 and 339-340 [rehg. den. (1970) 397 U.S. 978 (25 L.Ed.2d 274, 90 S.Ct. 1085)]; *Goldwater* v. *Ginzburg* (S.D.N.Y. 1966) 261 F.Supp. 784, 788; *Walker* v. *Courier-Journal and Louisville Times Company* (6th Cir. 1966) 368 F.2d 189, 191; *Pape* v. *Time, Incorporated* (7th Cir. 1965) 354 F.2d 558, 560-561 [cert. den. (1966) 384 U.S. 909 (16 L.Ed.2d 361, 86 S.Ct. 1339)]; *Arber* v. *Stahlin* (1969) 382 Mich. 300, 307-309 [170 N.W.2d 45, 48-49 [cert. den. (1970) 397 U.S. 924 (25 L.Ed.2d 103, 90 S.Ct. 927)]; *Belli* v. *Orlando Daily Newspapers, Inc., supra,* 389 F.2d 579, 587-588; *Grayson* v. *Curtis Publishing Company, supra,* 72 Wn.2d 999, 1007-1008 [436 P.2d 756, 762]; *Fox* v. *Kahn* (1966) 421 Pa. 563, 566-569 [221 A.2d 181, 183-184]; and Annotation, Defamation—Public Figures—Malice (1968) 20 A.L.R.3d 988, section 5, page 1004 and section 7, page 1012.

and intent play leading roles.' Poller v. Columbia Broadcasting Co., 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962).

"Moreover, since the question deals with the state of mind of defendants Ginzburg and Boroson, plaintiff ought to be able to have their testimony before the trier of fact in open court on cross-examination.

". . . . . . . . . . . . . . . . .

"Libel actions seem to me to be especially appropriate for trial to a jury. In this connection, it is interesting to note that in England libel actions are among the few civil actions which must be tried to a jury if one party so desires and if the case does not involve a prolonged examination of documents or accounts or a scientific or local investigation which may be inconveniently made with a jury. Administration of Justice (Miscellaneous Provisions) Act, 1933, 23 & 24 Geo. 5, ch. 36, § 6." (261 F.Supp. at p. 788.)

In *Klahr* v. *Winterble*, 4 Ariz.App. 158 [418 P.2d 404], the court rejected the contention that a summary judgment cannot be granted when an issue of fact pertains to a state of mind. (See *Peterson* v. *Valley National Bank of Phoenix* (1962) 90 Ariz. 361, 363 [368 P.2d 317, 318] good faith of pledgee; and *Alvado* v. *General Motors Corporation* (2d Cir. 1956) 229 F.2d 408, 411 [cert. den. (1956) 351 U.S. 983 (100 L.Ed. 1497, 76 S.Ct. 1050) and rehg. den. (1963) 371 U.S. 965 (9 L.Ed.2d 513, 83 S.Ct. 540)], bad faith of employer in entering into collective bargaining agreement.) The *Klahr* court concluded, "If all actions of libel similar to this must go to a full jury trial in order to ascertain whether criticism by analogy, invective and satire is believed in 'good faith' to be 'true,' the light of freedom of speech and press as enunciated in *New York Times* will be frustrated." (4 Ariz.App. at p. 170 [418 P.2d at p. 416].)

In *Goldwater* v. *Ginzburg*, as pointed out on appeal, there was ample circumstantial evidence which cumulatively might lead a jury reasonably to conclude that the defendants published the article with actual malice as required by *New York Times*. (*Goldwater* v. *Ginzburg, supra*, 414 F.2d 324, 336-337.) The true test must be the state of the evidence concerning the actual knowledge available to the publisher.

The correct principles are set forth in *Time, Inc.* v. *McLaney, supra*, as follows: "As we have previously stated, courts, federal courts in particular, are reluctant to deprive a litigant of the opportunity to present his case to a jury. Particularly under the Federal Constitution are the courts denied the right to do so if there be a disputed issue of fact, which, if found in favor of the losing party, would entitle him to have a verdict

by the jury sustained. Where, however, it is plain that the record has been fully developed by depositions and affidavits on a motion for summary judgment, and such record demonstrates that, construing all of the facts and inferences to be drawn therefrom in favor of the party against whom the judgment is entered, he would not be entitled to have a jury verdict stand, we have not hesitated to hold that the grant of summary judgment is proper." (406 F.2d at pp. 571-572.)

With the foregoing criteria in mind the record can be examined.

## II

In *New York Times Co.* v. *Sullivan, supra,* the opinion stated, "Finally, there is evidence that the Times published the advertisement without checking its accuracy against the news stories in the Times' own files. The mere presence of the stories in the files does not, of course, establish that the Times 'knew' the advertisement was false, since the state of mind required for actual malice would have to be brought home to the persons in the Times' organization having responsibility for the publication of the advertisement." (376 U.S. at p. 287 [11 L.Ed.2d at pp. 710-711].)

Defendant publisher contends that the plaintiff cannot take advantage of material collected by Lewis in connection with the first article without showing that knowledge of its content was "brought home" to the managing editor and assistant managing editor who were responsible for the publication of the Linn article.

Plaintiff contends that the publisher may be responsible for any knowledge of falsity or reckless disregard of the truth which may be laid at the foot of author Linn because he was a reporter. (See *New York Times Company* v. *Connor* (5th Cir. 1966) 365 F.2d 567, 573-577; but cf. *Associated Press* v. *Walker* (1967) 388 U.S. 130, 158-159 [18 L.Ed.2d 1094, 1112-1113, 87 S.Ct. 1975].) It is unnecessary to determine the responsibility of the publisher for Linn's knowledge and state of mind had he been a reporter. The evidence is uncontradicted that although his name appeared on the magazine's masthead as a contributing writer and he was commissioned to cover the trial, he was at all times acting as an independent contractor.

Plaintiff's contention that the managing editor and assistant managing editor, and therefore, the publisher, are charged with the knowledge of those subordinates to whom the Linn article was referred for checking

as to its accuracy is on firmer footing. It is not seriously questioned by defendant publisher, who asserts, as reviewed below, that the record fails to show that knowledge of the falsity of the Linn article, express or implied, was brought home to anyone in the publisher's organization.

## III

█  Plaintiff first asserts that there was actual knowledge of falsity of the Linn article because the publisher had received contrary and true information in connection with the preparation of the Lewis article.

The assistant managing editor explained the editing procedure used with the Linn article in his deposition as follows: "At that point [after editing the article to an appropriate size] the checking for accuracy began. While the senior editor had checked any apparent discrepancies in the manuscript, the copy department does a detailed check of any verifiable information, the spelling of names in contradiction—they look through the newspaper clippings to see if there are discrepancies.

"Those are all then referred to the writer, and he is asked to justify his version or clarify any discrepancies.

"Once that is done, the manuscript is turned over to the legal department, which does its own checking, again, if any. They ask the writer, 'What is your source for this,' or, 'Are you sure of that,' or, 'Was this part of the testimony,' or, 'Did you get this quotation from the testimony,' or, 'Did you get it from an interview, or what?'"

He also testified with respect to the Lewis article that some of the allegedly derogatory material in it was attributed to the statements of plaintiff himself. The witness acknowledged that he had not asked Lewis whether plaintiff had in fact made these statements, and added, ". . . I believe that the lawyers did, and it is customary practice for Lewis to interview people with a tape recorder." The witness did not have any tape recording of the Lewis interview, had never listened to one, and did not know whether or not Lewis had such a tape. A transcript of the tapes was produced by the defendants in connection with the litigation, and was admitted to be correct by plaintiff. It apparently demonstrates that the Lewis article correctly set forth matters which, whether correct or not, were vouched for by plaintiff in the interview. It is not contended otherwise on this appeal.

From the foregoing plaintiff assumes that the defendant publisher had

the Lewis tapes, and that the content of the Lewis tapes demonstrated the falsity of some of the statements in the Linn article. The evidence fails to support plaintiff's claim that the Lewis tapes were reviewed, or were available for review in connection with the editing and approval of the Linn article.

If it be assumed that there was such a review, the alleged falsity does not appear from the two extracts upon which plaintiff relies.[5] He first refers to statements which he alleges portrayed him as being incapable of handling a murder trial because of lack of experience or knowledge in the field of criminal law.[6] The first extract comes at the conclusion of a review of some of the factors known about Ruby's mental state, and introduces the facts leading up to plaintiff's employment to defend Ruby. Reference to the article reveals that in the author's opinion it would have been more logical to continue with Ruby's original hometown attorney. The second extract is followed by material extolling plaintiff's brilliant performance as a prosecutor of personal injury cases. The third extract expresses the author's theme, which he predicates on his observations of the trial. It is nowhere stated that plaintiff's incapacity was due to lack of experience or knowledge in the field of criminal law.

Moreover, the material from the Lewis tapes upon which the plaintiff relies does not demonstrate anything contrary to what is stated in the foregoing extracts. They show that he told Lewis that shortly prior to the interview he had secured two hung juries of 11 to 1 for acquittal and 9 to 3 for acquittal by asserting self-defense for an accused who had killed his wife's paramour, despite the fact the accused had gone armed to the victim's house "to thrash this out"; that he told Lewis he had been involved in over a hundred murder cases, probably 20 in the 10 years preceding the interview, with 90 percent success in the later cases, and apparently little success in the earlier, hopeless and desperate, cases.

---

[5]Plaintiff asserts that his two examples of "falsehoods known to CURTIS to be false are but two of many to be found in the record before the trial court." There is no duty on this court to search the record for evidence which will serve to overturn the judgment.

[6]The extracts read:

"The mind put on display in that courtroom in Dallas was not Jack Ruby's; it was the baffling mind of Melvin Belli, the enormously successful San Francisco personal-injury lawyer who, against all logic, became the chief attorney for the defense."

"After a very few days in court it became evident that the original impression of Belli as the perfect defense lawyer was simply not true. Belli is not, at heart, a defense lawyer at all. He is a prosecutor, . . ."

"This was a defense that did something else for Belli. In coming to the most important case in his life, Belli undoubtedly felt more comfortable about running on a familiar track. Because what Melvin Belli tried in that Dallas courtroom was neither a murder case nor an insanity case. He tried a personal-injury case."

Plaintiff secondly refers to statements in the article which he asserts made him look incompetent and careless and portrayed him as having no knowledge of psychomotor epilepsy.[7] When read in content with the account, which plaintiff does not attack, of the testimony of Dr. Gibbs, the defendants' interpretation of the testimony appears to be correct. Plaintiff insists that the Lewis tapes show that he in fact did know what "psychomotor variant" was. The material to which he refers in the Lewis tapes relates to "psychomotor epilepsy."[8] The article indicates that one doctor testified that "psychomotor variant" was used to describe "a type of seizure disorder" indicated by abnormalities in Ruby's electroencephalograms; that another doctor indicated it was a description of a brain wave pattern which occurs when a patient is drowsy or sleepy and was not a disease; that two doctors indicated psychomotor epilepsy could not be diagnosed from the electroencephalogram alone; that other doctors testified there was no abnormality in the tracings; and that Dr. Gibbs, though insisting that the tracings showed psychomotor variant and that it itself was a type of epilepsy, testified that it did not manifest itself in convulsive seizures, and that consciousness was commonly maintained throughout any seizure which did result.

---

[7]The extract reads: "Belli, of course, couldn't be sure they were going to miss it. Whether he realized it or not, in his eagerness to show his contempt for the people who had knocked his ears off, he was also telling me that he had based his insanity plea upon a misunderstanding. Psychomotor variant, if it exists at all, apparently is not what Belli thought it was.

"The real tragedy, as far as the defense was concerned, is that if Gibbs had been willing to testify from the beginning, Belli would have discovered the mistake and, presumably, abandoned the EEG machine, as Wade expected him to—and gone on to build a solid psychiatric case. Still, one might assume that before he did go ahead on the basis of a 135-word letter, Belli would have taken the precaution of flying up to Chicago to talk to Doctor Gibbs."

[8]The transcript of the tapes on which plaintiff relies recites: "MR. LEWIS: Have you been involved in a case before that dealt with temporary insanity? MR. BELLI: Oh, hell, yes. Hell, yes. I just finished a—and indeed I lost—an assault case down in —that I'm taking up on appeal. I'm going to make some law on this. No question. We have a fellow who shot at someone—[shot at a paint bucket on a painter's scaffold, bo'sun's chair, and hit the painter instead.] And just as he did it, he had a blackout. And this guy had a psychomotor epilepsy. And they ridiculed it. He went to the jail and had another one. [This one I'm taking up—this one's going to—MR. LEWIS: Where is this? MR. BELLI: This is in Riverside. San Bernardino. I'm trying to think of the name of the thing. It's on appeal now. I'll give it to you and I can send you a copy of the brief, too. This you should see.] This I examined the doctors at length on, on temporary insanity. This is psychomotor epilepsy." ([ ] indicates material deleted by plaintiff in his brief.)

The foregoing is followed by: "MR. LEWIS: You say this might generate some kind of law? MR. BELLI: Yes, it will. I think it will have a lot to do with this temporary insanity and with this epilepsy, psychomotor epilepsy, of which, unfortunately, there certainly is the condition. MR. LEWIS: Well, *is there any parallel between this case and the Ruby case?* MR. BELLI: No. Any more than someone goes into surgery is a parallel between one operation and another that lasts an hour." (Italics added.)

If it be assumed that the comments are false, there is nothing in the record to show that the publishing company, even if it had the Lewis tapes, had actual knowledge of any falsity.

## IV

In support of his position that the Linn article was published with reckless disregard of whether the articles were true or false, plaintiff relies upon principles set forth in *St. Amant* v. *Thompson* (1968) 390 U.S. 727 [20 L.Ed.2d 262, 88 S.Ct. 1323]. There the opinion of the court acknowledged, " 'Reckless disregard,' it is true, cannot be fully encompassed in one infallible definition. Inevitably its outer limits will be marked out through case-by-case adjudication, as is true with so many legal standards for judging concrete cases, whether the standard is provided by the Constitution, statutes, or case law." (390 U.S. at pp. 730-731 [20 L.Ed.2d at p. 267].) After reviewing earlier decisions the opinion concludes, "These cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." (*Id.*, at p. 731 [20 L.Ed.2d at p. 267].)

In *Curtis Publishing Co.* v. *Butts, supra,* four justices upheld the award to Butts under a test expressed by Justice Harlan as follows: "We consider and would hold that a 'public figure' who is not a public official may also recover damages for a defamatory falsehood whose substance makes substantial danger to reputation apparent, on a showing of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." (388 U.S. at p. 155 [18 L.Ed.2d at p. 1111].) In the companion case of *Associated Press* v. *Walker,* the same plurality, applying the same standard, reversed a state court judgment in favor of Walker because the trial court and state appellate court had each, in ruling that an award of punitive damages should be stricken, "found the evidence insufficient to support more than a finding of even ordinary negligence. . . ." (388 U.S. at p. 158 [18 L.Ed.2d at p. 1113].) Chief Justice Warren in an opinion in which Justices Brennan and White, who would have reversed both cases, concurred in part, rejected the standard quoted from the opinion of Justice Harlan and asserted that the *New York Times* test should be adhered to in the case of "public figures" as well as "public officials." (388 U.S. at pp. 163-165 [18 L.Ed.2d at pp. 1115-1117].)

Plaintiff properly concedes, as noted above, that the *New York Times* rule is applicable in this case. Nevertheless, he asserts that the views expressed in the opinions upholding the judgment for *Butts,* when applied to the facts of this case, demonstrate that there are facts, which if believed, would show a reckless disregard of whether the Linn article was false or not, because of a failure to investigate under the circumstances. (See 388 U.S. at pp. 157-158 and pp. 169-170 [18 L.Ed.2d at pp. 1112-1113 and pp. 1119-1120]; and note p. 172 [18 L.Ed.2d at p. 1121] in which Justices Brennan and White, who would have reversed the judgment for *Butts* for a new trial, agree that the evidence would have supported the judgment had the jury been properly instructed.)

Plaintiff recognizes. "Failure to investigate does not in itself establish bad faith." (*St. Amant* v. *Thompson, supra,* 390 U.S. 727, 733 [20 L.Ed.2d 262, 268]; and see *New York Times Co.* v. *Sullivan, supra,* 376 U.S. 254, 287-288 [11 L.Ed.2d 686, 710-711].) In *Curtis Publishing Co.* v. *Butts, supra,* the court noted, "Investigatory failures alone were held insufficient to satisfy this standard [enunciated in *New York Times.*]" (388 U.S. at p. 153 [18 L.Ed.2d at p. 1110]. See also *Baldine* v. *Sharon Herald Company* (3d Cir. 1968) 391 F.2d 703, 707.)

*St. Amant* suggests some circumstances which may give rise to serious doubts as to the truth of publications, as follows: "The defendant in a defamation action brought by a public official cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." (390 U.S. at p. 732 [20 L.Ed.2d at pp. 267-268]. See also *Cepeda* v. *Cowles Magazines and Broadcasting, Inc., supra,* 392 F.2d 417, 420-421 [cert. den. (1968) 393 U.S. 840 (21 L.Ed.2d 110, 89 S.Ct. 117)]; *Baldine* v. *Sharon Herald Company, supra,* 391 F.2d 703, 707; *Washington Post* v. *Keogh Company* (D.C. Cir. 1966) 365 F.2d 965, 972 [cert. den. (1967) 385 U.S. 1011 (17 L.Ed.2d 548, 87 S.Ct. 708)]; *New York Times* v. *Connor* (5th Cir. 1966) 365 F.2d 567, 576-577; and *Silbowitz* v. *Lepper* (1967) 55 Misc.2d 443, 446-447 [285 N.Y.S.2d 456, 460].)

Plaintiff adopts inconsistent positions in claiming that the record contains evidence to show that the publisher in fact entertained serious doubts as to the truth of the Linn article. On the one hand he seems to say that the investigation upon which the publisher relied and the content of the Lewis tapes demonstrated the existence of a doubt about the veracity of Linn's statements, and yet, at the same time, he asserts that further investigation should have been made.

On the former score he refers to the defendants' summary of the evidence in the points and authorities filed in support of their first[9] motion for summary judgment.[10] Plaintiff fails to refer to any facts, other than those reviewed above in part II, about which the defendants should have entertained doubt. The comments relating to the alleged discrepancy between the statement in the article and the content of the Lewis tapes is therefore applicable. He does claim, "Through a comparison of the LEWIS tape and the articles as published in the *Post* it is obvious that in many instances a misleading version of the facts resulted from the editing. Statements favorable to the plaintiff were deleted and other comments were taken out of context and placed in situations very unfavorable to plaintiff." He fails to refer to any portion of the record which shows that favorable statements were deleted, that comments were taken out of context, or that comments were placed in situations unfavorable for plaintiff. In any event, there is no principle which requires comment if made, and not false, or even if false and not within the *New York Times* rule, to be favorable. He who revels and prospers in the limelight of publicity may not complain if his failures are highlighted as well as his successes.

---

[9]The defendants' first motion for summary judgment was denied "for the reason that there are and it is contemplated that there will be further unresolved issues of fact to be determined at trial." Thereafter the plaintiff filed his answers to defendants' third set of interrogatories, and gave his deposition which had not been theretofore completed. It was then that the motion, which resulted in the present judgment, was renewed.

[10]The summary adopted by plaintiff reads: "The verification work was extensive, continuing 'over the course of several weeks, to verify the accuracy in every detail in the story' . . . First, the *Post's* copy department made a detailed check of all verifiable information, including a check against the defendants' files containing the extensive newspaper coverage of the trial of Jack Ruby . . . . Next, the article was turned over to the *Post's* medical editor, Steven Spencer, who analyzed the article and recommended changes . . . these changes were made . . . . Finally, the article was submitted for verification to two attorneys, Wilbur H. Haines, Jr., and John J. Runzer of the Philadelphia law firm of Pepper, Hamilton & Scheetz. These two attorneys were experienced in trial work . . . and their function was to review the author's analysis of and commentary upon the conduct of the trial . . . . Only after their approval was publication of the article permitted.

"The same method of editing, verification, and approval was followed for the Lewis article . . . ." (Reference to record omitted.)

Plaintiff relies on *Goldwater* v. *Ginzburg, supra,* in which the court upheld a judgment on the verdict for the plaintiff, and the trial court's order denying a summary judgment. The reviewing court noted, ". . . Ginzburg added certain innuendoes to some quoted statements and quoted other statements out of context in order to support his predetermined result. One cannot fairly argue his good faith or avoid liability by claiming that he is relying on the reports of another if the latter's statements or observations are altered or taken out of context. Also, if Ginzburg's 'melding' and 'distillation' of letters results in misplaced emphasis, or exaggeration, or distortion, he cannot reasonably maintain that the misstatements contained in the new product he thereby created are not his own misstatements." (414 F.2d at p. 337.)

In that case the trial court (*Goldwater* v. *Ginzburg, supra,* 261 F.Supp. 784), as is acknowledged by plaintiff in his brief, had noted numerous facts which tended to sustain the conclusions expressed by the reviewing court (261 F.Supp. at p. 787). No such facts have been brought to the court's attention in this case.

In asserting that further investigation should have been made, plaintiff relies upon the facts alluded to in the opinions adopted by seven justices in *Curtis Publishing Company* v. *Butts.*[11] He has failed to demonstrate in what manner the facts in this case parallel those in the *Butts* case upon which he relies, or in the quotation from *St. Amant* which is set forth above. The more apt analogy is found in the recitation of the facts in *Associated Press* v. *Walker,* which all of the justices participating in *Butts*

---

[11]The evidence referred to in the opinion of Justice Harlan, to which both the Chief Justice and Justice Brennan referred in their opinions, is summarized as follows: "The evidence showed that the Butts story was in no sense 'hot news' and the editors of the magazine recognized the need for a thorough investigation of the serious charges. Elementary precautions were, nevertheless, ignored. The Saturday Evening Post knew that Burnett had been placed on probation in connection with bad check charges, but proceeded to publish the story on the basis of his affidavit without substantial independent support. Burnett's notes were not even viewed by any of the magazine's personnel prior to publication. John Carmichael who was supposed to have been with Burnett when the phone call was overheard was not interviewed. No attempt was made to screen the films of the game to see if Burnett's information was accurate, and no attempt was made to find out whether Alabama had adjusted its plans after the alleged divulgence of information.

"The Post writer assigned to the story was not a football expert and no attempt was made to check the story with someone knowledgeable in the sport. At trial such experts indicated that the information in the Burnett notes was either such that it would be evident to any opposing coach from game films regularly exchanged or valueless. Those assisting the Post writer in his investigation were already deeply involved in another libel action, based on a different article, brought against Curtis Publishing Co. by the Alabama coach and unlikely to be the source of a complete and objective investigation." (388 U.S. at p. 158 [18 L.Ed.2d at pp. 1112-1113].)

agreed should be reversed. Justice Harlan's opinion recites, "In contrast to the *Butts* article, the dispatch which concerns us in *Walker* was news which required immediate dissemination. The Associated Press received the information from a correspondent who was present at the scene of the events and gave every indication of being trustworthy and competent. His dispatches in this instance with one minor exception, were internally consistent and would not have seemed unreasonable to one familiar with General Walker's prior publicized statements on the underlying controversy." (388 U.S. at pp. 158-159, fn. omitted [18 L.Ed.2d at p. 1113].) There was no necessity for such rapid dissemination in this case. Nevertheless, plaintiff has not pointed to anything in the record which indicates that the publisher was not entitled to rely on Linn as a competent and trustworthy reporter of the events he witnessed.[12] Contrary to plaintiff's contention on appeal, his prior statements, as publicized in the Lewis article, and as related on the Lewis tapes, were not inconsistent with the material in the Linn article, and did not render the latter unreasonable.

Plaintiff has also alluded to that portion of the opinion in *Curtis Publishing Co.* v. *Butts* in which the plurality opinion states, "The Saturday Evening Post was anxious to change its image by instituting a policy of 'sophisticated muckraking,' and the pressure to produce a successful exposé might have induced a stretching of standards." (388 U.S. at p. 158 [18 L.Ed.2d at p. 1113], and see also Warren, C. J. concurring, at p. 169 [18 L.Ed.2d at p. 1119].) Plaintiff has not indicated any evidence in the record in this case which would sustain a finding that the publisher was under similar pressure at the time the Linn article was published. Even if it be assumed that the plaintiff were entitled to take advantage of the

[12]In the trial court the plaintiff suggested in his answers to interrogatories that Linn's adverse comments were motivated by ill will toward plaintiff engendered because plaintiff would not give the writer exclusive interviews. He claimed that the publisher was a party to this spite. There is no evidence, other than plaintiff's conclusionary hearsay statements, that knowledge of Linn's alleged motivation was brought home to responsible employees of the publisher. (See opinion part II above.) In any event, in the absence of serious doubts as to the truth of the publication, the malice required by *New York Times* cannot be shown by merely demonstrating " 'spite, hostility or deliberate intention to harm.' " (*Greenbelt Pub. Assn.* v. *Bresler* (1970) 398 U.S. 6, 9-11 [26 L.Ed.2d 6, 12-13, 90 S.Ct. 1537]. See also *Garrison* v. *Louisiana* (1964) 379 U.S. 64, 70-75 [13 L.Ed.2d 125, 130-133, 85 S.Ct. 209]; and *Mullins* v. *Brando* (1970) 13 Cal.App.3d 409, 420-422 [91 Cal.Rptr. 796] [cert. den. 403 U.S. 923 (29 L.Ed.2d 701, 91 S.Ct. 2231)]. Cf. *Roemer* v. *Retail Credit Co.* (1970) 3 Cal.App.3d 368, 371 [83 Cal.Rptr. 540]; *Noonan* v. *Rousselot* (1966) 239 Cal. App.2d 447, 454 [48 Cal.Rptr. 817]; and *Fox* v. *Kahn, supra,* 421 Pa. 563, 567-568 [221 A.2d 181, 183-184], cert. den. (1966) 385 U.S. 935 [17 L.Ed.2d 215, 87 S.Ct. 292], which, insofar as they may suggest that the constitutional, as distinguished from some other, privilege may be lost because of the publisher's motivation, are inconsistent with *Greenbelt Pub. Assn.* v. *Bresler, supra.*)

*Butts'* finding by virtue of some type of collateral estoppel, proof of possible motivation, as discussed above, cannot substitute for actual malice as defined in *New York Times*. It does not establish that the article was published with knowledge that it was false, or that the publisher in fact entertained serious doubts as to the truth of its publication. It is only when coupled with other evidence, missing in this case, that the motivation could establish reckless disregard of whether it was false or not.

In *Butts,* Justice Harlan's opinion also noted that the publisher had been notified by the plaintiff and his daughter that the material about to be printed was false (388 U.S. at p. 161, fn. 23 [18 L.Ed.2d at p. 1114], and see Warren, C. J., concurring at pp. 169-170 [18 L.Ed.2d at pp. 1119-1120]). Plaintiff here refers to portions of the record in which he allegedly advised the publisher of the falsity of the Lewis article prior to its publication. When plaintiff's attack on the Lewis article was stultified by the tapes of the Lewis interviews, he shifted his grounds to use the tapes as the basis for his attack on the Linn article. Any demand for withholding or retracting the Lewis article therefore can have no bearing on the publisher's knowledge express or implied of any false statements in the subsequently published Linn article.

It is therefore concluded that there is no evidence to show that the defendant publisher published the Linn article with reckless disregard of whether it was false or not, or that the publisher in fact entertained serious doubts as to the truth of the article.

The judgment is affirmed.

Molinari, P. J., and Elkington, J., concurred.